**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
2                    BROWNSVILLE DIVISION
3
      BLANCA GOMEZ, ET AL.,
4
              Plaintiffs,
5
      AND                           C.A. NO.
6
      YVONNE MICHELLE ZAMORA,      1:22-CV-00036
7
              Plaintiff-Intervenor,
8
      vs.
9
10    CITY OF LYFORD, ET AL.,
11            Defendants.
12
13                    DEPOSITION OF
14                 KEITH ALLAN HOWSE
15                   JULY 25, 2023
16
17        DEPOSITION OF KEITH ALLAN HOWSE having been
18   duly sworn by TAUNEE DRECHSEL, Notary Public in and
19   for the State of Texas.  The witness appeared IN
20   PERSON in DALLAS, TEXAS, at 10:11 a.m. pursuant to
21   Texas Rule of Civil Procedure, the current Emergency
22   Order Regarding the COVID-19 State of Disaster, and
23   any provisions stated on the record or attached
24   hereto.
25
```

**Page 2**

```
1              APPEARANCES OF COUNSEL
2    On behalf of the Plaintiffs:
3         ISRAEL PEREZ LAW, PLLC
          Attorneys at Law
4         P.O. Box 260
          Fate, Texas 75132
5         469-897-4000
          BY:  ISRAEL PEREZ, ESQUIRE
6
7    On behalf of the Plaintiff-Intervenor:
8         YOUNGS & ROSILLO LAW FIRM, PLLC
          Attorneys at Law
9         621 South 10th Avenue
          Edinburg, Texas 78539
10        956-420-9999
          BY:  CHRISTOPHER YOUNGS, ESQUIRE
11
12   On behalf of the Defendant:
13        DENTON NAVARRO ROCHA BERNAL & ZECH, P.C.
          Attorneys at Law
14        701 East Harrison Avenue
          Suite 100
15        Harlingen, Texas 78550
          956-421-4904
16        BY:  JOHN-MICHAEL HAYWARD, ESQUIRE
17
      On behalf of the Defendant:
18
          ROERIG, OLIVEIRA & FISHER, LLP
19        Attorneys at Law
          855 West Price Road
20        Suite 9
          Brownsville, Texas 78520
21        956-542-5666
          BY:  D. ALAN ERWIN, JR., ESQUIRE
22
23   Also Present:
24
          Mark Hendrix, Videographer
25
```

**Page 3**

```
1              INDEX TO EXAMINATION
2
3    EXAMINATION                              PAGE
4    Examination by Mr. Hayward                 5
5    Examination by Mr. Erwin                 151
6    Examination by Mr. Perez                 161
7
8              INDEX OF EXHIBITS
9
10   DEFENDANTS'       DESCRIPTION            PAGE
11   Exhibit 1 - Notice of Deposition          5
12   Exhibit 2 - All documents provided by witness   15
13   Exhibit 3 - Incident Report              69
14   Exhibit 4 - Original Plea in intervention   70
15   Exhibit 5 - Plaintiffs Original Petition   71
16   Exhibit 6 - Final autopsy report         73
17   Exhibit 7 - Toxicology Report            74
18   Exhibit 8 - David Turbay, M.D. report    76
19   Exhibit 9 - First witness Statement made by Reyes   78
20   Exhibit 10 - Second Witness Statement by Fidel   78
21   Exhibit 11 - Newspaper article           89
22
23
24
25
```

**Page 4**

```
1              (On the record at 10:11 a.m.)
2         THE VIDEOGRAPHER:  Today's date is July 25th,
3    2023.  We are on the record at approximately 10:11
4    a.m. Central Time in the deposition of Keith Howse.
5    Start media one.
6         This is in regards to Blanca Gomez, et al.
7    and Yvonne Michelle Zamora versus the City of Lyford,
8    et al in the United States District Court for the
9    Southern District of Texas Brownsville Division Number
10   122CV00036.
11        Would all counsel please introduce yourselves
12   for the record, after which the court reporter will
13   swear in the witness.
14        MR. PEREZ:  Israel Perez for the Plaintiffs.
15        MR. ERWIN:  Alan Erwin for the Defendants,
16   the Lyford Police Department, and the City of Lyford.
17        MR. HAYWARD:  John-Michael Hayward for
18   Defendant Willacy County and Willacy County Sheriff's
19   Department.
20        MR. YOUNGS:  Christopher Youngs for the
21   Intervening-Plaintiff, Yvonne Michelle Zamora.
22        THE REPORTER:  Mr. Howse, please raise your
23   right hand.
24              KEITH ALLAN HOWSE
25   having been first duly sworn, testified as follows:
```



KEITH ALLAN HOWSE                                     July 25, 2023
BLANCA GOMEZ V. CITY OF LYFORD                             5–8

Page 5

1        THE REPORTER: Counsel, you may proceed.
2        MR. HAYWARD: Thank you.
3            EXAMINATION
4  BY MR. HAYWARD:
5        Q. Just a couple of quick questions. Please
6  state your full name and complete name for the record.
7        A. Keith Allan Howse.
8        Q. Have you ever gone by any other name?
9        A. No, sir.
10       Q. Where do you currently reside?
11       A. I reside in Southlake, Texas.
12       Q. Okay. What county is that in?
13       A. That's Tarrant.
14       Q. Okay.
15       A. T-A-R-R-A-N-T.
16       Q. Okay. Do you live anywhere else, whether in
17  or out of the state of Texas? Do you have another
18  residence?
19       A. No, sir.
20       Q. Okay. Before I continue on, let me just get
21  some housekeeping stuff out of the way. I see you
22  have brought some documents with you. I'm going to
23  show you a document. I'm going to label it as Exhibit
24  1.
25       (Defendants' Exhibit No. 1 was marked for

Page 6

1  identification.)
2        MR. HAYWARD: Thanks. Counsel, it's a
3  deposition notice.
4  BY MR. HAYWARD:
5        Q. Okay, sir. If you could just take a look at
6  that for me. Just kind of flip through it and let me
7  know when you are done.
8        A. Yes, sir. I recognize the document.
9        Q. And it sounds like you recognize the
10  document. Excuse me. That document is being the
11  deposition notice that you were given for this
12  deposition here today?
13       A. Yes, sir.
14       Q. Great. Could you please turn to the last
15  page? I know you have done this before, so you've
16  probably seen this before, correct?
17       A. Yes, sir.
18       Q. This is duces tecum.
19       A. Yes, sir.
20       Q. You know what that means. It's asking you to
21  bring certain documents, responsive documents to this
22  deposition?
23       A. Correct.
24       Q. Okay. Fantastic. Let me go through these, A
25  through J real quick. And I noticed you do have some

Page 7

1  documents with you. So let me just go through those.
2        Do you have any responsive documents to the
3  request for the copy of your entire file pertaining to
4  this case and/or your work as retained by the
5  Plaintiffs in this case or Counsels representing the
6  Plaintiffs in this case?
7        A. Yes, sir. I brought the print outs of the
8  case file.
9        Q. Okay. Could you hand those to me, please?
10  Thank you. And it very well may be that the documents
11  in here are also responsive to the other ones, but let
12  me just ask the questions, and then we can go through
13  them. Okay?
14       A. Yes, sir.
15       Q. Thank you. Okay. A copy of any and all
16  correspondence between you or your representatives and
17  the Plaintiffs or Plaintiffs' attorneys in this case.
18  Is that included in this packet?
19       A. Yes, sir. There are some emails in there.
20       Q. Fantastic. Could you do me a favor? Could
21  you just -- could you pull that out real quick?
22       A. Yes, sir. These would be the communications.
23       Q. Okay. So would this be all the responsive
24  documents that you have in your file referring to the
25  correspondence between you and the Plaintiff attorneys

Page 8

1  in this case?
2        A. I do have some billing as well. These are
3  billing statements that -- they were sent --
4        Q. Anything else or is this it?
5        A. I believe that is it with regard to any
6  communication.
7        Q. All right. Okay. Let's go through a copy of
8  any professional services agreements or contracts
9  concerning your work or opinions in this case and/or
10  compensation to you, or to be paid to you by
11  Plaintiffs or the Plaintiffs' attorneys?
12       A. Well, part of that was with the billing, but
13  then there is also a fee schedule here that lists it.
14  It itemizes the costs.
15       Q. Okay. I'll probably circle back to this in a
16  little bit. So it says you have an initial retainer
17  fee of $1,500. That gets paid upfront; is that right?
18       A. Yes, sir.
19       Q. Okay. And then you have here -- it looks
20  like a total of about $2,962.50 plus the initial
21  retainer. Does that sound about right?
22       A. The --
23       Q. Or was there more?
24       A. -- the total is the 2,962 less the retainer.
25  And this is a billing for the remainder 1,462.



Page 9

1    Q. Oh, okay. I see. I got it. So the total
2  was $2,962.50?
3    A. Yes, sir.
4    Q. That's the total amount that was billed to
5  date, I guess, not counting coming here to this
6  deposition?
7    A. Correct. Excluding a two-hour minimum on the
8  deposition.
9    Q. Oh, okay. And that's probably in your fee
10  schedule?
11    A. Yes, sir.
12    Q. Let me see. All right. Okay. And then a
13  copy of all invoices or bills for your services. It's
14  right there?
15    A. Yes, sir. That -- you have those.
16    Q. A copy of all articles, treatises,
17  authoritative texts, publications, or other letters
18  that are relied upon by you with regard to any
19  opinions rendered in this case. That would be E.
20    A. So for this, for E -- and in the report, I do
21  list sources and documentation that I referenced, you
22  know, for the report. But specifically there was an
23  article here by the Valley Morning Star that I looked
24  at. And I referenced the International Association of
25  Chiefs of Police excited delirium and recording police

Page 10

1  activity guidelines and policies. And I also cite the
2  Harris County Sheriff's Office policy on excited
3  delirium procedures. And this is that.
4    Q. Pardon. We can get into this in a minute.
5  But this Harris County Sheriff's Office excited
6  delirium -- this is the policy that I think you
7  actually directly copied and pasted into the report,
8  right?
9    A. Part of it. It was not complete. But --
10    Q. Yeah.
11    A. -- the relevant section.
12    Q. I'm sorry. I didn't mean to suggest you put
13  the whole thing in here, but you took parts of it and
14  put it into the report, correct?
15    A. I believe so.
16    Q. Okay. Well, let's go to the next one. So we
17  have copies of articles, treatises, authoritative
18  texts, publications, or other literature that you
19  contend support your opinions in this case.
20    Is everything that you gave me -- I have
21  everything here, right?
22    A. I did make a copy here relevant to a piece of
23  my opinion regarding cellphone seizing. And that was
24  in regard to Ms. Zamora.
25    Q. Is this -- okay. So before you hand that to

Page 11

1  me, let me make sure this is what I'm asking for
2  though. I'm still going to take it from you. So I'm
3  looking for anything that you used in support of the
4  report that you wrote. So for now if there is
5  anything that you considered after your
6  report -- excuse me -- after you wrote your report, I
7  want to kind of separate that.
8    A. No. Nothing after the report. The sources
9  that I specifically used for the report, again, are
10  listed in the report.
11    Q. Okay. Now you said something about a
12  cellphone -- I guess a paper on cellphone use or
13  something. Do you have that there with you?
14    A. This is -- some of that is information that I
15  provided you already from the International
16  Association of Chiefs of Police. This is an article
17  that I wrote for what is called Ethics Roll Call for
18  the Institute for Law Enforcement and for the
19  Administration.
20    And that is -- it starts a couple of pages back.
21  It's not the first one. But it's regarding seizure
22  and arrest of individuals' cellphones.
23    Q. You said that this is the one that you
24  authored?
25    A. Yes, sir.

Page 12

1    Q. Okay.
2    A. It starts a few pages back.
3    Q. Okay.
4    A. Yeah. I'll find it here. It's got two
5  articles combined here. So let's see here. This
6  would be where it starts for me.
7    Q. Okay. This was written in 2014?
8    A. Yes, sir. I believe that's right.
9    Q. On or about. Okay. To the extent not
10  included in your entire file as requested in letter A
11  above, copies of all notes, reports, drafts, or draft
12  reports concerning your opinions in this case.
13    A. I don't have any notes other than -- what I
14  do is when I start to write the report, I try to
15  create an outline, somewhat like an old fashion. Then
16  as I fill it in, it becomes the report. So I don't
17  have any separate notes.
18    Q. Okay. All right. List of cases in which you
19  have testified as an expert witness either by
20  deposition or trial. I know I have -- I know your
21  report lists cases that you have worked on in the last
22  four years. But do you have a complete reference?
23    A. No, sir. I didn't provide a complete
24  reference. I generally provide the four-year
25  requirement from the federal courts. I could



Page 13

1   certainly provide you additional information.
2       Q.  Yeah.  And that's what this subpoena asked
3   for.  It's not limited.  But okay.  Let me -- and
4   again, I'm going to go into your resume here in a
5   minute.  But just, you know, briefly can you tell me
6   when did you start offering services as an expert?
7   What year?
8       A.  Probably would have been approximately 2005.
9       Q.  Okay.  So if I'm looking here at the list of
10  cases that you did put down here over the last four
11  years -- okay.  So this is all the cases you worked on
12  in the last four years, right?
13      A.  These are the cases that I've testified
14  either in deposition or in court.  Testimony related
15  only.
16      Q.  Okay.  About how many cases have you
17  testified in since you started?
18      A.  I would have to give you an estimate.
19      Q.  Okay.
20      A.  But I would say probably, off the top of my
21  head, 90 to 100.  Well, I'm sorry.  You said
22  testified, correct?
23      Q.  Yes.
24      A.  Not worked.  Yeah.  It would be less than
25  that.  Probably testified either deposition or trial

Page 14

1   testimony maybe 15 to 20.
2       Q.  Fifteen to twenty?
3       A.  Yes, sir.
4       Q.  Okay.
5       A.  Just defining it to some sort of testimony.
6       Q.  Correct.  Yes.  So about 15 or 20 total since
7   2005; is that right?
8       A.  Approximately.
9       Q.  Okay.
10      A.  I'd have to, again, prepare you a specific
11  list.
12      Q.  Color copies of any and all photographs,
13  diagrams, or other reproduction pertaining to this
14  case.
15      A.  No reproductions, or diagrams, or
16  photographs.
17      Q.  As in you just don't have anything responsive
18  to the request?
19      A.  Yes, sir.  I did not receive any, and I have
20  not produced any.
21      Q.  Okay.  All documents, tangible things,
22  reports, models, or date compilations that have been
23  provided to, or viewed by, or prepared to
24  you -- excuse me -- by or for you in anticipation of
25  your testimony or opinions in this case.

Page 15

1       A.  Yes, sir.  Again, most all of this is through
2   the discovery process, Plaintiffs' petitions, some
3   expert reports I have prepared, an incident report
4   from the City of Lyford Police Department.  I believe
5   that's everything included in this group.  And some
6   witness statements from Willacy County inmates.  And
7   subpoena information.
8       Q.  What is that?
9       A.  This is my report.
10      Q.  Okay.  I'm looking -- the reason I'm asking
11  is I don't think I have that cover page for some
12  reason.  Can I see that?
13      A.  Yes, sir.  It's just a letterhead.
14      Q.  Okay.  Let's see.  Okay.  I'm just going to
15  make this entire packet Exhibit 2 here.  Hopefully I
16  didn't lose anything in the process, but I think I put
17  it all back together.
18      (Defendants' Exhibit No. 2 was marked for
19  identification.)
20      MR. HAYWARD:  Thanks.
21      THE WITNESS:  Surely.
22  BY MR. HAYWARD:
23      Q.  Thanks.  I'm going to keep this over here.
24  And then if I ask you anything, of course, pertaining
25  to -- actually, you know what?  I'm just going to

Page 16

1   leave this here with you.  Let's just leave it here
2   with you.  And that way when I ask you questions, if
3   you want to look something up, feel free to do that.
4   Okay?
5       A.  Sure.  Thank you.
6       Q.  No problem.  Okay.  Okay, sir.  Obviously
7   having done this before, you do understand that your
8   testimony here today is under oath, and it is the same
9   as the testimony that you would give in trial under
10  oath?
11      A.  Absolutely.  Yes, sir.
12      Q.  And obviously you understand what the penalty
13  is for not telling the truth under oath?
14      A.  Yes, sir.
15      Q.  Okay.  Let's go ahead and -- can you turn to
16  your expert report, please?  Because I'm going to
17  start asking some questions about some of the
18  information in here.
19      A.  Yes, sir.
20      Q.  Okay.  So let's go ahead and just turn to the
21  last page.  I don't want to belittle this too much,
22  but I just kind of want to ask a couple of questions
23  about some of these cases that you worked on in the
24  last four years.
25      A.  Yes, sir.  Go ahead.



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
17—20

Page 17

1    Q. Okay. Great. So according to this, it
2 appears like in the last four years you testified
3 in -- and correct me if I'm wrong, but it looks like
4 four state cases and three federal cases?
5    A. I believe that is correct.
6    Q. Okay. All right. So on this first one here,
7 Barbara Coats vs. Harris County. Who did you -- I'm
8 sorry. Not who did you represent. Who were you
9 retained by, the plaintiff or the defendant?
10    A. That was plaintiff.
11    Q. And it says use of deadly force. Just
12 briefly, what kind of force was at issue in that case?
13    A. That case was involving a Harris County
14 Constable's Office, deadly force, denial of emergency
15 medical care regarding a drug overdose.
16    Q. Was this a death case?
17    A. Yes.
18    Q. Okay. Was this a death case that occurred, I
19 guess, like at the scene of an arrest or was this an
20 in-custody death? Or excuse me, was this a jail
21 death?
22    A. It was -- I would classify it as an
23 in-custody death.
24    Q. Yes. But did it occur at a scene, or did it
25 occur in a jail?

Page 18

1    A. It occurred outside of a jail environment.
2 It was in a shopping center parking lot as a result of
3 officers responding to a call.
4    Q. Okay. The next case, Parker v. Briggs. This
5 looks like -- okay. This is a Louisiana State case.
6 It says security procedure. Just briefly, does this
7 involve law enforcement, this case?
8    A. It -- not so much in the death -- in the
9 process of how the individual died. More so there
10 were some issues on the investigation side. But
11 primarily it was a, what I could call, classified as a
12 security negligence kind of case.
13    Q. Did you represent the plaintiff or the
14 defendant?
15    A. That was plaintiff as well in a premises
16 liability case.
17    Q. Premises liability?
18    A. Yes, sir.
19    Q. Negligence failed action?
20    A. Yes, sir.
21    Q. Okay. The next case, Flowers v. JKS Security
22 State case. Is this a law enforcement related case?
23    A. It was a, what I would refer to, as a hybrid
24 case. It involved in a security officer's actions,
25 use of force; however that security officer was also a

Page 19

1 former police officer. And there were issues with
2 police training that he had received. So it was
3 really both I guess you'd say.
4    Q. Were there any parties in that case that were
5 actual law enforcement? Like was there a department
6 involved, a city involved?
7    A. No, sir. He was former law enforcement, and
8 it involved his training as a law enforcement officer.
9    Q. Okay.
10    A. But he was no longer associated at that time
11 with the department.
12    Q. I guess the answer to my question is with
13 regards to the parties in the case, there were no
14 police officers directly sued, and there were no
15 cities or police departments as parties in the
16 lawsuit?
17    A. That would be correct. Yes.
18    Q. How about the Ruda v. State of New Jersey?
19 Is this a law enforcement related case?
20    A. I would consider it more of a security use of
21 force case.
22    Q. With regard to parties, were there any
23 parties in the case that were either active police
24 officers being sued in their official capacity,
25 cities, police departments, anything like that?

Page 20

1    A. Well, in that case, I was retained by the
2 State of New Jersey, which was the Defendant. And the
3 State of New Jersey operated -- obviously operates
4 with police powers. But this was a mental hospital
5 under their jurisdiction that they operated.
6    Q. So no law enforcement agencies were directly
7 added as parties in that case?
8    A. There were no parties that were law
9 enforcement officers. Only State security officers.
10    Q. Okay. All right. The next one is Holman v.
11 Harris County. Okay. So this one -- this is the one
12 you said is police procedure use of force. What was
13 the use of force at issue in this case?
14    A. This case involved the Harris County
15 Sheriff's Office and the use of tasers on a disabled
16 individual. And I was retained by plaintiff's
17 counsel. And it was -- yeah. It was Harris County
18 Sheriff's deputies use of force. No death.
19    Q. Okay. Did the issues in this case arise from
20 an incident that occurred inside of a jail? Or was it
21 outside at a scene somewhere?
22    A. It was outside of a convenience store.
23    Q. Yeah. All right. Next one Ida Nobles, et
24 al. v. Sergeant Richard Egal. This is Austin, Texas
25 District Court. It says police procedure use of



KEITH ALLAN HOWSE                                      July 25, 2023
BLANCA GOMEZ V. CITY OF LYFORD                         21—24

Page 21

1  deadly force.  Do you see that case?
2      A.  Yes, sir.
3      Q.  Okay.  Okay.  Use of deadly force.
4  Obviously, there is a death here.  What was the use of
5  force at issue?
6      A.  This -- I was retained by plaintiff's
7  counsel.  It involved a shooting death by two
8  Austin -- City of Austin police officers.
9      Q.  Okay.  It probably goes without saying, but
10  for purposes of clarity, did this shooting death occur
11  inside of a jail or outside somewhere?
12      A.  It was outside on 6th Street in Austin,
13  Texas.
14      Q.  When they say 6th Street is getting
15  dangerous, they're not kidding.
16      A.  Yes, sir.
17      Q.  Okay.  The next one is Stephen Bryant III v.
18  Galveston County.  It says police procedure use of
19  force.  What was the use of force at issue here?
20      A.  Again, retained by plaintiff's counsel.  And
21  this was Galveston County Sherriff's Office deputy's
22  use of force on a subject that was in custody in the
23  patrol vehicle.  Not in a jail but while in custody in
24  the backseat of a patrol vehicle.
25      Q.  Is this a death case?

Page 22

1      A.  No, sir.  It did not involve a death.  And,
2  just to clarify, since this report was written, I did
3  just a couple weeks ago testify in another deposition
4  that is not listed on here.
5      Q.  What is the name of that case, please?
6      A.  Let's see.  So that -- I can't find that
7  anywhere.  That is -- I believe it is going to be
8  titled Brian King v. Potsdam P-O-T-S-D-A-M, I believe,
9  New York Police Department -- or city -- or I'm sorry.
10  It's called Village of Potsdam.
11      Q.  Federal case?
12      A.  Yes, sir.  United States District Court for
13  the Northern District of New York.
14      Q.  Use of force case?
15      A.  Yes, sir.  Use of force, again, in taking an
16  individual into custody.
17      Q.  This is a death case?
18      A.  No, sir.  Just injury only.
19      Q.  Did the injuries occur inside of a jail or
20  outside of it?
21      A.  No, sir.  It occurred on the street.  I will
22  take that back a little bit, sir.  There was an issue
23  inside the booking area of the jail.  It was really in
24  both places.
25      Q.  And you said you have already testified in

Page 23

1  that case?
2      A.  Via deposition.
3      Q.  Plaintiff or -- for the plaintiff or for the
4  defendant?
5      A.  For the plaintiff.
6      Q.  What specifically were you hired as an expert
7  to give an opinion on in that case?
8      A.  The use of force and arrest procedure.
9      Q.  The arrest procedure.  Okay.  Were you asked
10  to give any expert testimony as to jail policy or the,
11  I guess, the overall procedure of the handling and the
12  booking process?
13      A.  No, sir.
14      Q.  Okay.  Anything else?  Or are we up to speed
15  pretty much, that you can remember?
16      A.  Yes.  As far as actual testimony via
17  deposition or court.
18      Q.  I mean, I'm not going to ask you about cases
19  you don't have listed down here since it would do no
20  good since you don't have anything to reference.  But
21  I think that's good, the last four years.
22      I'm assuming you have testified for the defense
23  at some point in time; is that correct?  Or have you
24  primarily only been for the plaintiff?
25      A.  Well, the Ruda case was for the State of New

Page 24

1  Jersey, which was defense.  And then I've had several
2  other defense cases.  But it's primarily plaintiff by
3  nature.
4      Q.  With respect to the testimony that you give
5  where specifically you support cases involving law
6  enforcement activity, not security, procedure -- the
7  Ruda case is what I was looking at.  Have those all
8  been plaintiff -- or, excuse.  Have you always been
9  retained by a plaintiff or in those cases or have you
10  done some for the defense as well?
11      A.  I have done some for the defense as well.
12      Q.  Okay.  Are you able to -- I mean, to the best
13  of your ability, are you able to recall the case or
14  cases that you did work on for the defense?
15      A.  I do recall a couple right off the top of my
16  head.  One was involving the Travis County Constable's
17  Office in Austin regarding a training matter and a
18  police officer wrongfully terminated from the training
19  program.
20      Q.  Okay.  So that's not really a use of force.
21  That sounds more like an employment type of a case?
22      A.  It was training related, police training
23  procedure.
24      Q.  Okay.  But was it an employment case?  Were
25  they getting sued because --



KEITH ALLAN HOWSE                                                    July 25, 2023
BLANCA GOMEZ V. CITY OF LYFORD                                       25–28

Page 25

1   A. That was an element of it. But I wasn't
2   asked to comment on the employment aspect. I was
3   asked to research the field training program and how
4   it was operated.
5   Q. All right. I'll just skip that one. Just
6   I'm asking was the lawsuit an employment lawsuit? Or
7   do you not remember?
8   A. I don't recall.
9   Q. Okay.
10  A. I believe there was initially an EEOC
11  investigation--
12  Q. Yeah.
13  A. -- and then the lawsuit followed after that.
14  And, again, my focus was the field training component
15  for the Travis County Constables' Office.
16  Q. I understand. And listen, I mean, I'm happy
17  to let you, you know, give a further explanation if
18  you want. It would help things kind of speed along if
19  I do ask you a question that's more of a direct
20  yes-or-no question, if you're able to give that. I'd
21  appreciate it. That way I don't have to keep asking
22  the question again. Is that okay?
23  A. I understand.
24  Q. Okay. Thanks. Okay. So having done this
25  for a while, you understand the difference between

Page 26

1   being a retained expert and a consulting expert?
2   A. Yes, sir. And I did want to backtrack to
3   your other question. There was another case, if you
4   care to hear about that.
5   Q. That's okay. Let's just focus on this. I
6   appreciate it. If I want to, I'll come back to that.
7   A. I understand.
8   Q. But so in your capacity acting as an expert,
9   you are aware there is a difference between a retained
10  expert and a consulting expert?
11  A. Yes, sir.
12  Q. Okay. What would be your understanding of
13  that? What is the difference?
14  A. Well, generally as a consulting expert, you
15  may not necessarily testify. I have generally been
16  retained as a retained expert who is expected to
17  testify.
18  Q. Okay. Has a client -- or, I guess, has an
19  attorney who has reached out to you for services, ever
20  declined to use you as an expert because of an opinion
21  that you provided that they did not like?
22  A. I'm sorry. Restate that.
23  Q. Sure. So somebody reaches out to you for
24  expert services. They ask you to take a look at
25  information and provide an expert report to them.

Page 27

1   Okay? You provide them information, and they don't
2   like the information that you're providing them. Do
3   you understand what I'm saying?
4   A. Yes, sir. That has occurred.
5   Q. That has occurred? Okay. What kind of cases
6   does that typically occur?
7   A. Well, generally, a report is never written
8   because my initial assessment, for whatever reason,
9   does not interest counsel, and it's over. Typically
10  that's where it stops.
11  Q. Okay. Yeah. The question is what kind of
12  cases, if you can, recall does that typically occur
13  on?
14  A. It's police use of force for arrest,
15  sometimes false arrest-type cases. Those are the two
16  primary.
17  Q. Has an attorney that has retained you, ever
18  removed you as an expert in the case after you have
19  already been designated as an expert?
20  A. No, sir. Not that I'm aware of.
21  Q. Okay. Has an attorney that has retained you
22  ever removed you as an expert in a case after you gave
23  your deposition testimony?
24  A. No, sir.
25  Q. Have you ever been -- to your knowledge, have

Page 28

1   you ever been struck as an expert in any of the cases
2   in which you provided expert services?
3   A. No, sir.
4   Q. Okay. So since 2005, you've never been
5   struck in a lawsuit before, as an expert?
6   A. Not that I'm aware of.
7   Q. And that includes both state and federal; is
8   that correct?
9   A. Yes, sir.
10  Q. Okay. In your career of providing expert
11  services, have you ever provided expert services in a
12  field or discipline other than law enforcement?
13  A. Well, security management, I'd guess you say.
14  Security use of force. They're somewhat parallel
15  topics.
16  Q. Okay. Now according to your resume, you are
17  a licensed attorney; is that correct?
18  A. Yes, sir.
19  Q. Okay. Have you ever been retained as an
20  expert in a case for the purpose of providing an
21  expert legal opinion based on you being an attorney?
22  A. No, sir.
23  Q. Okay. Other than in your capacity of
24  providing expert services, have you ever been a party
25  in a lawsuit, whether civil or criminal?



KEITH ALLAN HOWSE                                         July 25, 2023
BLANCA GOMEZ V. CITY OF LYFORD                            29–32

Page 29

1    A.  Yes.
2    Q.  Okay.  How many times?
3    A.  One time.  It was a civil case, personal
4  civil case.
5    Q.  Okay.  Were you the plaintiff or the
6  defendant?
7    A.  Myself and my wife were plaintiffs in an
8  eviction case in Tarrant County.
9    Q.  Is that the only one?
10   A.  Yes, sir.
11   Q.  Okay.  Have you ever testified in a criminal
12  matter?
13   A.  Yes, sir.
14   Q.  Is that -- you'll have to forgive me.  But is
15  that one of the cases where you were working for the
16  state?  Or is this something else?
17   A.  Are you referring to as an expert or --
18   Q.  Yeah.
19   A.  -- because I was a police offer.
20   Q.  Let me rephrase my question.  Yeah.  Let me
21  rephrase my question because I just realized you are
22  correct.  You do have a long law enforcement career,
23  so I'll ask you about that as well.
24     So in your expert capacity, have you ever
25  testified in a criminal matter for the district

Page 30

1  attorney's office or for a criminal defense attorney?
2    A.  No, sir.
3    Q.  Are you sure about that?
4    A.  As an expert in a criminal matter in a case
5  filed by the DA, I don't believe so.  I don't recall.
6    Q.  Okay.  And then as a police officer, have you
7  testified in any criminal matters?
8    A.  Yes, sir.
9    Q.  Okay.  Like a lot?  Is it memorable?  Is it a
10  small amount?  What are we talking about?
11   A.  Small, I would say.
12   Q.  Okay.  Do you recall how many times?
13   A.  I recall a motor vehicle theft, arrest.  That
14  was probably the only one I testified at.  I had
15  multiple standbys that never ended up in testimony.
16   Q.  Okay.  So motor vehicle, are we talking like
17  a traffic ticket?
18   A.  No.  I'm sorry.  A theft of a motor vehicle.
19   Q.  Theft of a motor vehicle.  Okay.  Anything
20  else?
21   A.  There may have been, but just off the top of
22  my head I don't recall.
23   Q.  Okay.
24   A.  As I mentioned, lots of -- I was called down
25  lots of times.

Page 31

1    Q.  But that you can remember, just the one that
2  you can remember?
3    A.  Yes, sir.
4    Q.  Okay.  Okay.  In your capacity as a police
5  officer, have you ever given testimony under oath
6  which was later determined to be untruthful?
7    A.  No, sir.
8    Q.  Have you ever been convicted of or charged
9  with any crime, whether in Texas or anywhere else in
10  the world?
11   A.  No, sir.
12   Q.  Okay.  You are familiar with the -- I mean,
13  obviously you are familiar with what an F-5 is?
14   A.  Yes, sir.
15   Q.  Okay.  Separational Licensee.  And at the
16  bottom it has the choices that the chief, or whoever
17  your department, you know, superior is, where you are
18  either given a designation of honorable, general, or
19  dishonorable.
20   A.  Correct.
21   Q.  Okay.  Have you ever received a general
22  discharge?
23   A.  No, sir.
24   Q.  Have you ever resigned in lieu of receiving
25  either a dishonorable or general discharge?

Page 32

1    A.  No, sir.
2    Q.  Have you ever resigned in lieu of any pending
3  criminal action?
4    A.  No, sir.
5    Q.  Have you ever resigned in lieu of any pending
6  disciplinary action?
7    A.  No, sir.
8    Q.  While you were a police officer, have you
9  ever, for whatever reason, been suspended?
10   A.  No, sir.
11   Q.  Have you, as a police officer, ever been
12  given a written reprimand?
13   A.  I don't believe so.  No, sir.
14   Q.  How about a verbal reprimand?
15   A.  Oh, yes, sir.  I'm sure I probably had a
16  supervisor offer some guidance or counseling, you
17  know, from time to time.  Absolutely.
18   Q.  Have you ever been the subject of an internal
19  affairs investigation, also known as an IA
20  Investigation?
21   A.  No, sir.
22   Q.  Have you ever received -- and again, let me
23  just back up by saying that I just have to go through
24  these questions.  I don't want you to take offense to
25  them, but I got to ask them.  Okay?



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023

33–36

Page 33

1    A. I understand. Understand.

2    Q. All right. So have you ever received any

3 citizen complaints while serving in a law enforcement

4 or security related capacity?

5    A. I don't recall any.

6    Q. Okay. Have you ever worked in a jail or

7 prison?

8    A. No, sir.

9    Q. Have you ever written policies and/or

10 procedures specifically for a local or county jail?

11    A. Only to the extent of a local holding cell, a

12 detention holding cell, that was maintained by our

13 police department. But again, that was not at the

14 jail. That was a holding cell prior to prisoners

15 being taken to jail.

16    Q. Right. And I'm going to get to that in a

17 minute because I'm going to need a little bit of

18 clarification as to, I guess, your duty station when

19 you were an officer. But I'll get to that in just a

20 minute.

21    Okay. Have you ever served in the capacity as an

22 elected sheriff?

23    A. No, sir.

24    Q. Have you ever been employed by a county

25 sheriff's department, whether in this state or another

Page 34

1 state?

2    A. Not --

3    Q. As a deputy sheriff.

4    A. Not as a deputy sheriff. No, sir.

5    Q. Thanks. Have you ever worked for a law

6 enforcement agency? This is excluding private

7 contracting in the Rio Grande Valley?

8    A. No, sir.

9    Q. Do you speak Spanish fluently?

10    A. No, sir.

11    Q. Do you speak any Spanish?

12    A. Pocito.

13    Q. Enough to make you dangerous at the

14 restaurant?

15    A. Yes, sir.

16    Q. Okay. All right. That's fair. Okay.

17    What are all the law enforcement departments,

18 exactly, that you have worked for over the years as a

19 peace officer?

20    A. The -- and I'm going to clarify this because

21 it may not show up correctly on the peak hole record.

22 But primarily it was the Baylor Health Care System

23 Department of Public Safety is the official title. It

24 was commonly just called Baylor Police. And then also

25 the Dallas County Constables' Office, Precinct Number

Page 35

1 1 in Dallas. Q. I promise this isn't a gotcha

2 moment, but I don't recall seeing the Constable

3 precinct. I'm sure it's in here. Can you point to

4 it, please, in your report?

5    A. No, sir. You're correct, and I do

6 probably -- if you'll bear with me, I need to explain

7 that on the peak hole record, it will be listed for

8 agencies that I've worked with. In reality, even

9 though my commission was carried by the Dallas County

10 Constable, and I was a deputy constable -- reserve

11 deputy constable, my assignment was at Baylor, and I

12 was paid by Baylor.

13    And so that's why I've listed it as continuously

14 with Baylor from an employment perspective.

15    Q. Okay. So for the lay people who are not law

16 enforcement personnel, how does that work? If you

17 work either a primary duty station is Baylor

18 University Medical Center, but you're also a reserve

19 deputy constable for Dallas County Constable Precinct?

20    A. It is a little unusual. I will grant you

21 that. The Baylor Police Department operated under a

22 section of the Texas Education Code, which allowed its

23 security personnel to be licensed peace officers. The

24 law changed affecting the description and

25 authorization of who could -- what kind of educational

Page 36

1 institutions could operate under that law.

2    Because of the change, we had to seek a change in

3 the law with -- the next time the legislature came

4 into session. In that interim, which is about a year

5 and a half or so, the Dallas County Constable Mike

6 Pappas Precinct One hired all of our officers as

7 reserve deputy constables.

8    However, he assigned us back to our original

9 carrier, which is in precinct one, which is also

10 available. Subsequently, the law was changed

11 reauthorizing Baylor Healthcare System and some other

12 institutions to have peace officers, and we converted

13 back to Baylor.

14    Q. Okay. So obviously there's a lot of

15 confusing bureaucracy going on there, but it seems

16 like my takeaway from that is, is that

17 you're -- during that time, you're reserve deputy

18 constable, and you're still, I guess, working at

19 Baylor University Medical Center or working that

20 jurisdiction; is that correct?

21    A. Yes, sir. For the most part, there were

22 occasions where we did other items. We were kind of

23 all hands-on deck kind of defense, but that was the

24 primary assignment, and that's who we were paid by.

25    Q. Right. Okay. I appreciate that. I mean, I



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
37—40

Page 37

1  can understand why that might not make the resume,
2  because it sounds like it's a little bit more in name
3  only since you're getting paid by the university
4  still; is that correct?
5      A.  Yes, sir.  As I mentioned, there were some
6  duties.
7      Q.  Well, what were some of those duties?
8      A.  Well, whenever there were parades or large
9  public events, things of that nature, that multiple
10  agencies might work, we would assist with those.
11      Q.  Okay.  During the time in your capacity as
12  constable, would the name of being a deputy constable,
13  other than doing parades and other type of events to
14  help out were you actively patrolling in other
15  jurisdictions?
16      A.  No, sir.  We were assigned to the Baylor
17  area.
18      Q.  When you say Baylor area, you're talking
19  about the Baylor University Medical Center?
20      A.  The Baylor University Medical Center campus,
21  I guess we would say which is what's known as Old East
22  Dallas.
23      Q.  Okay.  So other than that interaction with
24  the constable's precinct one, and the Baylor
25  University Medical Center, is that the entirety of

Page 38

1  your career in law enforcement, working for an agency?
2      A.  Yes.  Actual paid employment.
3      Q.  Okay.  All right.  I'm going to start
4  referring to page 14 if you want to go ahead and flip
5  there, page 14 of your report.  Let's see.  It looks
6  like this.  It's the one that's got your current and
7  past licenses and information.
8      A.  Gotcha.  All right.
9      Q.  Okay.  So typically when I see this there's
10  dates on here, so if you can help me with some of
11  these.  Primarily what was the date that you received
12  your peace officers license?  I guess it would be your
13  basic peace officer certification; is that right?
14      A.  Yes, sir.  It would be -- that's the peace
15  officer course.  That would have been -- I'm going to
16  say maybe May of 1988 approximately.
17      Q.  May of 1988?  Okay.  All right.  So let me
18  make sure I'm understanding this correctly.  It's
19  probably with me but I'm having a hard time kind of
20  understanding the layout of your resume here, so
21  correct me if I'm wrong.
22      So you're saying you worked at Baylor Department
23  of Public Safety from 1982 to 2007; is that right?
24      A.  Yes, sir.
25      Q.  All right.  And then if I go back here to

Page 39

1  page 14 and we start going from the bottom up, that's
2  kind of, I guess, the chronological order; is that
3  right?
4      A.  There's -- you're referring to the licenses
5  and certifications.
6      Q.  Actually, I'm referring to your job positions
7  here.
8      A.  I've got --
9      Q.  So let me rephrase this.  It looks like the
10  first position you had with Baylor was public service
11  officer, 1982 to 1985; is that right?
12      A.  Yes, sir.
13      Q.  Okay.  So according to your certificate date
14  as a public service officer during this time, you
15  weren't a peace officer at that time?
16      A.  That's correct.  A public service officer is
17  also the term we use for security officer.
18      Q.  Right.  And all I'm getting -- all I'm trying
19  to ask is you weren't a licensed peace officer at that
20  time, right?
21      A.  That's correct.
22      Q.  Yeah.  And then the next one says
23  corporal/(indiscernible) medical technician field
24  training officer, 1985 to 1986.  This one says
25  provided field training to new officers and

Page 40

1  functioning as a weekend patrol supervisor.
2      According to your certification date, you were
3  not a licensed peace officer at this time?
4      A.  That's correct.  I was a security officer at
5  the time or a corporal.
6      Q.  Right.  And that's where I'm trying to make
7  sure I understand.  I don't want to get confused.  But
8  this rank of corporal is not a rank of corporal as a
9  peace officer but as a, you call them, security
10  officer; is that right?
11      A.  That's correct.
12      Q.  All right.  Okay.  Then we go up here to the
13  lieutenant of police.  All right.  This one says 1986
14  to 1991.  Managed the crime prevention, fire
15  prevention unit as well as partnering in traffic
16  division.
17      So this one says it started in 1986.  Is this an
18  accurate time that the peace officer certification in
19  1988?
20      A.  Yes, sir.  Not -- not to make it again any
21  more convoluted than it already is, but when I began
22  employment at Baylor it was -- they were a security
23  plant, they were not a police department.
24      We received authority from the state legislature
25  to commission the police department.  And during that



Page 41

1  period is when I attended the police academy, however
2  my title was lieutenant because I had been promoted to
3  the rank of lieutenant and would assume the rank of
4  lieutenant upon graduation from the academy.
5      Q. All right. So let me stop you there for a
6  moment. So you were a lieutenant in the security
7  force at Baylor, and then they went through procedures
8  to create a, I guess, police department; is that
9  correct so far?
10     A. Yes, sir.
11     Q. Okay.
12     A. Legislature authorized creation of the
13  licensed police agency.
14     Q. Right. And then you go to your basic peace
15  officer's academy. It's an academy, right?
16     A. Yeah.
17     Q. You went to academy. That's six months. Is
18  it still six months?
19     A. Well, they vary. At the time, I would say it
20  was probably four and a half months.
21     Q. Okay. But you went to the same academy that
22  pretty much everybody else does, like people that
23  would -- let me put it this way. The academy that you
24  graduated from would be the same academy that somebody
25  that was working for Dallas PD would graduate from?

Page 42

1      A. Well, of course Dallas PD has their own
2  academy, but yes. It was a state certified police
3  academy. Peace officer academy is the peace officer
4  academy --
5      Q. Perfect.
6      A. -- or the peace officer academy.
7      Q. Gotcha. But you came out as a lieutenant
8  from the police academy; is that right?
9      A. Yes, sir. While I attended my internal rank
10  for Baylor was lieutenant. However, I attended the
11  academy as a cadet.
12     Q. Okay. So all right. So I guess from what
13  I'm understanding now, okay. You're going to get your
14  license in 1988. You become a lieutenant of the then
15  newly formed Baylor Department of Public Safety.
16     A. Yes.
17     Q. All right. Let me back up real quick, now
18  that I have that background it helps me a lot. All
19  right. So starting back from your first duties with
20  Baylor as a public service officer, okay, it says that
21  you patrolled on foot and in a marked vehicle.
22     I'm interested to know from this point forward
23  what was the jurisdictions for -- I know you mentioned
24  campus before. And I've never been there before, so
25  are we talking about the campuses that have a gate

Page 43

1  running all the way around it?
2      I mean, what are we talking about?
3      A. Well, the -- the Baylor University Medical
4  Center is not too far from here. It sits on about 40
5  blocks of urban property. It's bounded by downtown
6  Dallas. Again, I mentioned Old East Dallas, Fair
7  Park, and an area called Deep Ellen, which is an
8  entertainment district, I would describe it as.
9      Q. Okay. The campus, is it at all in any way
10  gate guarded? Does it have walls?
11     A. No, sir.
12     Q. No. But it does have a jurisdiction line for
13  lack of better words, right?
14     A. A jurisdiction line? You mean --
15     Q. For you and others who are working for the
16  Baylor Department of Public Safety.
17     A. Yes. You're a property owned and controlled
18  by Baylor.
19     Q. Got it. So when we talk about like for
20  example as a public service officer and you talk about
21  patrolling on foot and in a marked vehicle, it's
22  within the compounds of that campus?
23     A. Yes, sir. It -- it would be -- for lack of a
24  better term, it would be in property owned or
25  controlled by Baylor University Medical Center.

Page 44

1      Q. Okay. As a public service officer, what kind
2  of weapons, if any did you carry on your person?
3      A. I carried firearms.
4      Q. As a public service officer that wasn't
5  licensed peace officer?
6      A. Yes, sir. We were licensed. Well, we were
7  what's called commissioned security officer.
8      Q. So as a security officer, you did carry a
9  firearm?
10     A. Yes, sir.
11     Q. Okay. Anything else?
12     A. A baton.
13     Q. Okay. At that time, you had a baton?
14     A. Yes, sir. What we called a street stick.
15  Not the fancy as, but just, you know, straight baton.
16     Q. Okay. And in your duties as a corporal EMT
17  field training officer, what kind of weapons did you
18  carry?
19     A. Same weapons. Armed and same baton, but we
20  were cross-trained as either emergency medical
21  technicians or emergency care attendants.
22     Q. Okay. And then we bump up here to captain of
23  police, 1991 to 1997. What kind of weapons did you
24  carry?
25     A. Same thing. Armed position, except at that



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
45–48

Page 45

1  point, we had converted to collapsible batons. Those
2  were the -- well, we carried pepper spray as well as
3  an intermediate weapon.
4     Q. Okay.
5     A. I believe the pepper spray also -- all of
6  that started with the lieutenant of police when we
7  became a formal police agency.
8     Q. I appreciate that. That's kind of what I'm
9  looking for too is over the years if something else
10  has been added or taken away. Just let me know.
11     Okay. So as the captain, you're now a licensed
12  peace officer. You said that you had modified the
13  weapons and asked. You had pepper spray.
14     So as a lieutenant and a captain, are you
15  still -- in those roles, are you still doing patrol,
16  or are you more administrative or management now?
17     A. As a lieutenant, I was still doing regular
18  patrol. Patrol basically shift supervisor, but there
19  were some days that were more, I would describe, as
20  administrative in nature. But then as a captain, it
21  shifted over more so to be predominately
22  administrative. However, due to the size of the
23  agency, still routinely did patrols or did stakeouts
24  or other operational field work backup -- backup
25  patrol officers on serious calls, things of that

Page 46

1  nature.
2     Q. Okay. Then we bump up here to director of
3  public safety, assistant chief of police, 1997 to
4  2007. Okay. How about, did the weapons change at all
5  when you got into this role from '97 to 2007?
6     A. So '97. At some point, it might have been
7  right around '97 or '98, we transitioned to Glock,
8  semi-automatic .40 caliber firearms.
9     Q. Anything else change in the non-lethal
10  department?
11     A. In the non-lethal?
12     Q. Yes.
13     A. I don't believe so.
14     Q. During your time with Baylor University
15  Medical Center, had you ever been issued a taser?
16     A. No, sir.
17     Q. Okay. So during your time there, it was, I
18  guess for a lack of a better word, either lethal,
19  which is a pistol that you carry on you, correct so
20  far?
21     A. Yes, sir.
22     Q. Okay. Some type of device, whether it was a
23  baton or an asp, collapsible, right?
24     A. Yes, sir.
25     Q. And then pepper spray.

Page 47

1     A. Yes, sir.
2     Q. Okay.
3     A. And also, we were individually issued, but we
4  also maintained pepper ball guns for large
5  disbursement, but that was not an individual carry
6  item. And then we also had shotguns. Again, they
7  were issued for patrol or when otherwise necessary.
8     Q. Anything else? Any AR-15s? Anything like
9  that?
10     A. We did have AR-15s in the -- in the armory.
11     Q. Okay. Okay. Now, you mentioned earlier
12  before, I think -- I had a question about this anyway.
13  At some point in time at Baylor University Medical
14  Center, like, a holding cell was created; is that
15  correct? Is that what you told me?
16     A. Yes, sir. At one point, we had one, and then
17  we moved to a new facility. Then we had two.
18     Q. Okay. Was it always classified as a holding
19  cell, though?
20     A. Yes, sir.
21     Q. Okay. So then am I correct in saying that
22  the purpose of the holding cell -- it goes without
23  saying that it was to hold somebody until they could
24  be transferred to and booked into an actual jail?
25     A. Yes, sir.

Page 48

1     Q. Okay. In your career with Baylor University,
2  had you ever been involved with an in-custody death?
3     A. Can you narrow that down a little? You mean
4  where I was personally involved?
5     Q. Yeah.
6     A. No, sir. Not -- I was never involved in any
7  in custody death.
8     Q. In your career at Baylor University, had you
9  ever been involved with a citizen death which resulted
10  from law enforcement use of force?
11     A. No, sir.
12     Q. In your career with Baylor University, had
13  you ever arrested somebody?
14     A. Yes, sir. Yeah.
15     Q. And what were the typical charges that people
16  would get arrested for on Baylor Medical University
17  campus? What would you see most of the time?
18     A. The majority are what I would call social
19  disorder types of activity, public drunkenness,
20  thefts, disturbances, disorderly conduct, things like
21  that.
22     Q. Now, on this campus, is this a campus, I
23  guess, for students going to medical school?
24     A. No, sir. It is primarily what I would refer
25  to as a medical campus consisting of multiple



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
49—52

Page 49

1  hospitals and a level one trauma center, as well as
2  educational facilities, laboratory facilities, parking
3  facilities.  The Baylor College of Medicine, which is
4  the medical school, is actually in Houston.  The
5  school of nursing, however, is in Dallas.
6      Q.  Okay.  So this particular campus, this is a
7  true medical center campus.  So are your encounters
8  with people, as far as social -- like you call them
9  social disorder situations, are these encounters with
10  people that are either entering the hospital or being
11  brought into the hospital by somebody else?
12      A.  Yes and no.  When we gained our authorization
13  for a police agency status, our jurisdiction was
14  expanded to city streets as well.  And -- so many of
15  our contacts weren't necessarily going to the
16  hospital, let's say.  It may have been a traffic stop,
17  or a suspicious person stop, or somebody's passing
18  through.
19      The area of town there is very transient.
20  There's a detoxification center not too far away.
21  It's an urbanized environment, and again, adjacent to
22  downtown, if that -- you have to kind of understand
23  the -- the features of the campus.
24      Q.  Okay.  In your career with Baylor University,
25  had you ever personally been involved with a encounter

Page 50

1  with a member of the public where you needed to use
2  force?
3      A.  Yes, sir.
4      Q.  Okay.  What kind of force are we talking
5  about?
6      A.  I would call it hands on.  Open hand control
7  sometimes it's called.  And occasionally you
8  (indiscernible) to produce a weapon, but I've never
9  fired -- never had to fire the weapon.
10      Q.  Have you ever used pepper spray on a person
11  during your employment with Baylor University Medical
12  Center?
13      A.  I don't think I ever personally used it.  I
14  was present, but not -- I don't think I ever applied
15  it myself other than in training.
16      Q.  Okay.  So you haven't used it on any member
17  of the public?
18      A.  Well, if you considered -- again, in
19  training, that's part of the training.  You -- you
20  will be exposed to it and use it on -- on -- but it's
21  another officer.
22      Q.  Okay.  So have you ever used it in your past
23  as a police officer on any member of public -- excuse
24  me -- on a member of the public discharging your
25  duties as a law enforcement officer?

Page 51

1      A.  No, sir.  I don't believe so.
2      Q.  Okay.  Have you ever used a Taser on a
3  person?  I know you said you (indiscernible) issued
4  one before, but have you ever used a Taser in working
5  with the Baylor University Medical Center?
6      A.  No, sir.
7      Q.  How about the baton or the ASP that you
8  talked about on a member of the public discharging
9  your duties as a law enforcement officer?
10      A.  I've never struck anyone.  I have -- again,
11  like the firearm, I have produced it several times.
12      Q.  Okay.  So while you worked with Baylor
13  University Medical Center after you became a peace
14  officer and you would arrest a person, where would you
15  transport them?  Where would you take them?
16      A.  Well, first, as I mentioned, they would go in
17  a holding cell, and after paperwork was done, they
18  will be transferred to the Lew Sterrett Justice Center
19  in Dallas County Jail.
20      Q.  Did all arrests on your campus always have to
21  stop at that first point at the holding cell, or did
22  they always or -- did they on occasion go straight to
23  the county jail?
24      A.  There -- there may have been some occasions
25  on a warrant arrest where they may have gone straight

Page 52

1  to county jail that was out of Dallas County, but the
2  majority of the time, they would go to holding cell.
3      Q.  When you say they were transferred from the
4  holding cell, is that something that an officer with
5  the Baylor University Medical Center would be doing
6  the transferring, or would somebody else come and pick
7  them up from another jurisdiction?
8      A.  It could be both.  Generally, it was the
9  officer -- the Baylor officer that would be doing the
10  transport, but again, in some situations, it -- it
11  might be that the local agency would come and get
12  them.
13      Q.  Okay.  You mentioned this earlier that a lot
14  of the encounters that you've dealt with were what you
15  called social disorders.  I believe you said things
16  like public intoxication; is that correct?
17      A.  Yes, sir.
18      Q.  All right.  And public intoxication, is that
19  something that a person can be arrested for?
20      A.  Yes, sir.
21      Q.  Okay.  Have you ever personally arrested
22  somebody for public intoxication, specifically?
23      A.  Yes, sir.  Early on.  Yeah.
24      Q.  Had you ever had somebody who you arrested
25  for public intoxication resist arrest?



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
53–56

Page 53

1    A.  No, sir, not that I would consider -- I mean,
2  uncooperative perhaps, but not resisting.  No, sir.
3    Q.  Have you heard of something like that as a
4  law enforcement officer?  Other people in your
5  department where they had occasion to deal with
6  somebody who was public intoxicated but also resisted
7  arrest?
8    A.  Well, absolutely.  Yes, sir.
9    Q.  Yeah.  Every time you arrested somebody for
10  public intoxication, did you always know what
11  substances that person was on?
12    A.  Not necessarily all substances.  No, sir.
13  But alcohol was pretty discernable.
14    Q.  To your knowledge, while you worked with
15  Baylor University Medical Center, had there been any
16  law enforcement-related deaths that your department
17  was directly involved with?
18    A.  Meaning caused by officers of the Baylor
19  (indiscernible)?
20    Q.  Yeah.  The officer interacted with a member
21  of the public.  However that went down, but the person
22  ended up dying?
23    A.  No, sir.  No deaths --
24    Q.  Okay.  How about shootings?  Like, during
25  your time there, was there ever one of your officers

Page 54

1  involved in the shooting?
2    A.  Yes, sir.
3    Q.  Okay.  What happened with that?  Do you have
4  any idea?
5    A.  There were several or -- 2 or 3.  One
6  involved an officer attempting to intervene in a theft
7  from a 7-Eleven, and the individual would not stop and
8  ran into the officer, throwing the officer up on the
9  hood of the vehicle, and the officer fired at the
10  individual.  But there was no death associated with
11  that.  Yeah.  The other --
12    Q.  No.  That's okay.  Let's keep going here.  So
13  there's something I did want to ask you about.  I kind
14  of forgot to circle back on.  But your time with
15  Baylor University, from when you were a public service
16  officer all the way to being the Director of Public
17  Safety, were you all times in a full-time position
18  with them?
19    A.  Yes, sir.
20    Q.  Okay.
21    A.  Talking about all of the time periods
22  (indiscernible) full-time.
23    Q.  Were full-time.  Okay.  Thanks.  You guys
24  didn't have like a reserve program there other than
25  this constable thing that you were talking about?

Page 55

1    A.  No, sir.  There -- there's no provision in
2  law for our kind of vacancy to have a reserve program.
3    Q.  Okay.  Let me go over your education now a
4  little bit, okay?  So let me see where we at here.
5  Okay.  So before entering -- at least from your
6  resume, it looks like before entering the law
7  enforcement you received your associate's degree at
8  Del Mar College Corpus Christi?
9    A.  Correct.
10    Q.  Okay.  That was in 1980.  And so I can
11  understand more clearly, are the years that are down
12  here are these the years that you started or the years
13  that you got your degree?
14    A.  Graduation.
15    Q.  Graduation.  Got it.  You got your associates
16  in 1980.  Okay.
17    A.  Yes, sir.
18    Q.  And then, if I'm reading this correctly, you
19  went back to school once you had been employed with
20  Baylor University for a while, right?
21    A.  Correct.
22    Q.  Okay.  On this one here, where it says that
23  you went to University of Texas in Arlington, I know
24  the graduation date looks like it's 1995.  When did
25  you start going back to school?

Page 56

1    A.  I think I started going part-time back to
2  school about the time I graduated from the academy,
3  and I continued to pursue -- pursue my bachelor's.  So
4  that was part-time.  So I'm going to guesstimate here
5  1989, right around in there, I started back part-time.
6    Q.  Okay.  And then, after graduating, it looks
7  like you went -- did you go straight into Texas
8  Wesleyan School of Law?
9    A.  Yes, sir.  I graduated during the summer of
10  '95 from UTA, and I started Texas Wesleyan School of
11  Law that same summer in 1995, about four weeks after
12  graduation from UTA.
13    Q.  Okay.  You were full-time in law school?
14    A.  No, sir.  That was a part-time four-year
15  program --
16    Q.  Okay.
17    A.  -- while I continued to work full-time at
18  Baylor.
19    Q.  So like night school?
20    A.  Predominately.
21    Q.  Okay.
22    A.  Not all of it, but predominantly.
23    Q.  All right.  And then, during this time, just
24  so I can understand, does your employer pay for the
25  schooling, or you paying for that yourself?



Page 57

1    A. They paid a good portion of it. I would say
2  probably came out to 60 to 70 percent.
3    Q. Okay. And you maintained full-time status
4  with Baylor University Medical Center during your time
5  going to UT Arlington and Texas Wesleyan School of
6  Law?
7    A. Yes, sir. It had to be full-time for the
8  tuition assistance.
9    Q. Mr. Howse, what law firm specifically reached
10  out to you for your services in this case?
11    A. Counsel Mr. Perez.
12    Q. Has any other law firm reached out to you in
13  this case regarding providing expert services?
14    A. I don't believe so.
15    Q. Have you spoken with any other attorneys
16  regarding this case other than myself right now and
17  other than Mr. Perez?
18    A. No, sir.
19    Q. What have you been asked to do in this case
20  by the plaintiff? Specifically, what was your
21  assignment?
22    A. To evaluate the use of force and police
23  procedures utilized in the arrest of Mr. Zamora and
24  the custody -- taking him into custody.
25    Q. So given your history of experience and the

Page 58

1  things that we've talked about, what specifically are
2  you holding yourself out to be an expert of in this
3  report?
4    A. The use of force, police procedure, training.
5    Q. Are you holding yourself out to be an expert
6  in any way, shape, or form with procedures and
7  policies regarding jails?
8    A. Regarding policies of jails, is that your
9  question?
10    Q. Yes.
11    A. No. I'm not -- I haven't addressed any or
12  seen any policy from the Willacy County Jail.
13    Q. That's not what I'm asking. I'm asking are
14  you holding yourself out to be an expert in this case
15  for purposes of making an opinion on policies and
16  procedures with respect to jails?
17    A. Not -- in all due respect, not with respect
18  to jail policies, as I mentioned. However, I'm
19  addressing conduct of the deputies who went from point
20  A to point B point. Point B being the jail.
21    MR. HAYWARD: Objection. Nonresponsive.
22  BY MR. HAYWARD:
23    Q. Okay. I appreciate that you want to give me
24  some more full answers. But it's very important that
25  you answer specifically, especially with regards to

Page 59

1  what it is that you're giving opinion on here in this
2  case, okay?
3    A. Yes, sir. And I've done that.
4    Q. (Indiscernible).
5    A. I've answered the fact that I evaluated the
6  deputy's conduct and the police officer conduct that
7  involved and unseen locations and at the jail. But
8  that's not necessarily jail policy, as you asked me
9  about, and I've not commented on that.
10    Q. Right, which is why I'm asking you a very
11  specific question. So with respect to making an
12  opinion on jail policies and procedures, are you
13  holding yourself out to be an expert with respect to
14  policies and procedures within the jail?
15    A. I would say no with regard to policies and
16  procedures only.
17    Q. Okay. Thank you. Okay. So I'm not sure if
18  you're aware of this. I don't know if it means
19  anything to you, but I don't actually see anywhere in
20  your report where you refer to your opinions as being
21  an expert opinion. So I want to ask a question about
22  that, okay?
23    So are you stating here today that all the
24  opinions in your report, every time you give an
25  opinion, that this is an opinion you're giving in your

Page 60

1  expert capacity?
2    A. Yes, sir. I stated in here to a reasonable
3  degree of certainty, right in the report regarding
4  professional standards, practices, and training.
5    Q. Okay. Are you saying that, in your report,
6  every time that you give an opinion, you're giving it
7  in your expert capacity?
8    A. Yes, sir.
9    Q. Okay. In your testimony here today, are the
10  opinions that you are given based solely on your
11  scientific, technical, or other specialized knowledge?
12    A. Yes, sir.
13    Q. In your testimony here, are your opinions
14  based on a review of sufficient facts and data?
15    A. Well --
16    Q. That's a long pause there.
17    A. Yeah. I'm -- I don't want to give you
18  another long, drawn-out answer, but the items that
19  I've listed in the report is what I have to review.
20  There is a significant amount of what are referred to
21  as evidence that has not been made available yet. So
22  as you'll notice on this report, it states it's a
23  preliminary report based on these items I've listed.
24    Q. Okay. And Mr. Howse, I can't really think of
25  how to make this any more of a simple question. So



Page 61

1  I'm trying to ask this again, okay?
2      Is the opinions in this report that you've made
3  are they based on a review from you sufficient facts
4  and data?
5      A. Sufficient to prepare a preliminary report.
6      Q. Okay. So is a preliminary report to you the
7  same as an expert report?
8      A. It's still an expert report.
9      Q. Okay. So if it's an expert report, the
10 opinions that you're giving in there, you'd have to
11 agree with me your opinions would have to be based on
12 a review of sufficient facts and data, right?
13     A. There's sufficient facts and data to prepare
14 a preliminary report. There is evidence, as I've
15 stated in the report, that has not been submitted --
16     MR. HAYWARD: Objection. Nonresponsive.
17 BY MR. HAYWARD:
18     Q. I mean, I think we're getting kind of lost
19 here because this is either an expert report or it's
20 not, right?
21     A. It's an expert report --
22     Q. Okay. Great. And so --
23     A. -- based on these items that I've listed.
24     Q. Okay. So you got an opportunity to review
25 sufficient facts and data to make the opinions that

Page 62

1  you've made in this report; is that right?
2      A. In this report, solely.
3      Q. What do you mean solely?
4      A. Meaning I reserve the right to provide a
5  supplemental report --
6      Q. Okay.
7      A. -- on new evidence.
8      Q. Okay. You'd agree with me that in order to
9  provide a supplemental or amended report, you would
10 need to at least have an expert report on file that
11 meets the expert standards and requirements, right?
12     A. Yes, sir. I've said it's an expert report
13 several times.
14     Q. Okay. That's why I'm asking you. So your
15 opinion that this report satisfies the standards for
16 an expert report; is that right?
17     A. For a preliminary expert.
18     MR. HAYWARD: Objection. Nonresponsive.
19 BY MR. HAYWARD:
20     Q. Does this report satisfy the requirements of
21 an expert report or not?
22     A. Yes, sir.
23     Q. Thank you. Okay. Is it your testimony here
24 today that your opinions are the product of reliable
25 principles and methods?

Page 63

1      A. Yes, sir.
2      Q. And that you have reliably applied the
3  principles and methods to the facts of this case?
4      A. Yes, sir.
5      Q. Would you agree with me that in order for you
6  to testify as an expert, you must be qualified in the
7  specific area that you're giving an opinion?
8      A. Yes, sir.
9      Q. And that your testimony be both reliable and
10 relevant to the lawsuit?
11     A. Yes, sir.
12     Q. Would you agree with me that, as an expert,
13 you cannot give opinions regarding matters in which
14 you are not qualified?
15     A. That's correct.
16     Q. Would you agree with me that regardless of
17 whether you have certain qualification as an expert,
18 you cannot give opinions regarding matters in which
19 you have no data to support your positions?
20     A. Yes, sir.
21     Q. Would you agree with me that your opinions as
22 an expert cannot be based on unsupported speculation
23 or subjective belief?
24     A. To apart.
25     Q. Through apart?

Page 64

1      A. Well, for instance, hypotheticals are often
2  discussed, and so I'm not sure exactly specifically
3  what you're asking.
4      Q. Do you understand the difference between
5  objective and subjective belief?
6      A. Yes, sir.
7      Q. Okay. And you know what speculation is; is
8  that right?
9      A. Yes, sir.
10     Q. Okay. So would you agree with me that your
11 opinions as an expert cannot be based on unsupported
12 speculation or subjective belief?
13     A. Yes, sir. I -- I agree with that, in
14 general, with the caveat that I mentioned earlier.
15     Q. What caveat is that?
16     A. Presented hypotheticals that may or may not
17 be real.
18     Q. Okay. So are you saying that you're allowed
19 to give expert opinion on hypothetical that's not
20 based on fact, that's based purely on speculation?
21     A. I get asked hypotheticals all the time.
22     Q. That's not what I'm asking you. Are you
23 saying that you're able to deliver in an expert
24 opinion in a report that's based on unsupported
25 speculation and subjective belief?



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
65–68

Page 65

1    A. It's not unsupported. My belief is based
2  upon what I've listed here. My 46 years of
3  professional experience and training.
4    Q. Sir, it's just a general question. I haven't
5  even (indiscernible). I mean, I can't even get the
6  report yet because we're stuck on these questions.
7  This is a general question.
8    As an expert -- it doesn't matter if it's this
9  case -- as an expert would you agree with me that you
10  cannot base an expert opinion on unsupported
11  speculation or subjective belief?
12    A. Yes, sir. Generally speaking, that is
13  correct.
14    Q. Generally speaking, again. Okay.
15    A. With the exception of --
16    MR. HAYWARD: Objection. Nonresponsive.
17  That's okay.
18  BY MR. HAYWARD:
19    Q. Would you agree with me that just having a
20  career in law enforcement does not necessarily make
21  you an expert in all things law enforcement related?
22    A. I would probably agree.
23    Q. Okay. Are you stating under oath here today
24  that you are qualified to render expert opinions in
25  this case on the use of force specific to any custody

Page 66

1  jail death cases?
2    A. Yes, sir, to the extent that I have rendered
3  my opinion.
4    Q. What does that mean?
5    A. As I've mentioned before, I have not
6  discussed, proceed, or evaluated policy and procedure
7  for jails. I've evaluated officer conduct.
8    Q. Okay. So are you stating under oath here
9  today that you're qualified to render expert opinions
10  on the policy implementation as it relates to inmate
11  detention at the county jail?
12    A. No, sir.
13    Q. Are you stating under oath here today that
14  you're qualified to render expert opinions on inmate
15  classification and housing of inmates at that county
16  jail?
17    A. No, sir.
18    Q. Okay. Go ahead and -- I think you're already
19  open to the first page. I'm going just start going
20  over this document here. So I'm looking at your
21  report that's entitled preliminary report. The very
22  first page.
23    Okay. Did anyone else write or prepare portions
24  of this report or things that were later included in
25  this report?

Page 67

1    A. No, sir.
2    Q. Okay. And just to be clear, this is not a
3  draft report, right? This is an actual expert report
4  that --
5    A. (Indiscernible) it's an expert report.
6    Q. Are there any opinions in this report which
7  you want to address right now before we get into them
8  that you think may not constitute an expert opinion or
9  are incapable of meeting the requirements with respect
10  to expert opinions?
11    A. No, sir.
12    Q. And you stand by the opinions and assertions
13  that you made this report?
14    A. Yes, sir. I do.
15    Q. Okay. In the introductory paragraph here, I
16  think you mentioned that you have -- I think you
17  referenced that you rely on 46 years of professional
18  experience in the fields of public safety and law
19  enforcement?
20    A. Yes, sir.
21    Q. Okay. And just to be clear, this encompasses
22  the time that you spent in the security field as well
23  as the time that you've spent in your own private
24  practice; is that correct?
25    A. No, sir. It includes -- in that period, as a

Page 68

1  young teenager, I worked with the Explorers Post with
2  the Corpus Christi Police Department while I was in
3  high school and participated in police patrols for
4  about four years -- and that would be weekends
5  basically -- and learned a great value during that
6  period before I ever had any formal education or
7  professional experience.
8    Q. Got it. So you're including your time in the
9  Explorer program or whatever that you were doing prior
10  to becoming a law enforcement officer?
11    A. Most of it.
12    Q. Okay. That's what's being included in the
13  (indiscernible) of the 46 years?
14    A. Yes, sir. It started around age 17 -- 16,17.
15    Q. Okay. Okay. So let's just look real quick
16  here where it sources and documentation. Okay. So
17  this particular list here includes some different
18  things. I'll call it that. It looks like it includes
19  some actual documents that may have information about
20  the case, and then there's a lot of references to
21  things like Penal Code, criminal procedure,
22  constitution, things like that that don't have factual
23  information about the incident. Would you agree with
24  that?
25    A. Yes, sir.



KEITH ALLAN HOWSE                                    July 25, 2023
BLANCA GOMEZ V. CITY OF LYFORD                        69–72

Page 69
1     Q.  Okay.  So the first one you have listed here
2   is this Lyford incident report.  I gave you the packet
3   of information.  I'm guessing it's probably in there.
4     A.  Yes, sir.
5     Q.  But if not -- why don't we do this?  For your
6   own benefit, why don't you leave that pile together,
7   and I'm going to make a separate --
8     A.  Okay.
9     Q.  -- exhibit, okay?  I think it might be a
10   little easier.  Let's see.  I don't want to get you
11   confused with everything, so --
12     A.  That's fine.  I thought I had it up top --
13     Q.  -- let's just.
14     A.  -- there.
15     Q.  There you go.  Just take a look at that and
16   let me know if you've seen that before.
17     A.  Yes, sir.
18     Q.  Okay.  I'm going to try and go over these
19   documents first, not in great detail.  We'll come back
20   to them when we go through the report, okay, but this
21   is the same document that you reviewed; is that right?
22     A.  Yes, sir.
23     Q.  All right.  And with respect to this, it's
24   called the City of Lyford incident report.
25       (Defendants' Exhibit No. 3 was marked for

Page 70
1   identification.)
2   BY MR. HAYWARD:
3     Q.  Would you agree with me that this incident
4   report did not cover all of the events as alleged in
5   the plaintiffs' lawsuit?
6       THE REPORTER:  Did you just hand him a
7   document?
8       MR. HAYWARD:  Yes.  I did.
9       THE REPORTER:  Is that 3.
10       MR. HAYWARD:  That's Exhibit 3.
11       THE REPORTER:  Okay.
12       MR. HAYWARD:  Yes.
13       THE REPORTER:  Thank you.
14       THE WITNESS:  Yes.  I would agree with that.
15   BY MR. HAYWARD:
16     Q.  Okay.
17       MR. HAYWARD:  This is going be county
18   defendants' Exhibit Number 4.
19       (Defendants' Exhibit No. 4 was marked for
20   identification.)
21       MR. ERWIN:  (Indiscernible)?
22       MR. HAYWARD:  Yes.
23   BY MR. HAYWARD:
24     Q.  Here you go.  If you could just look at that
25   and tell me if that's the document that you referred

Page 71
1   to here in your sources and documentation?
2     A.  Yes, sir.  I believe this is one of them.
3     Q.  Okay.
4     A.  Yes, sir.
5     Q.  Okay.  So are you able to distinguish the
6   difference in this case between the plaintiffs and the
7   parties that are calling themselves intervenors?
8     A.  I believe so.
9     Q.  Okay.  So who is intervener in this case?
10     A.  I believe it's Yvonne.
11       MR. HAYWARD:  (Indiscernible).
12       MR. ERWIN:  (Indiscernible).
13   BY MR. HAYWARD:
14     Q.  I'm going to show you another document.  This
15   is Exhibit 5.  I represent to you that this is called
16   the plaintiffs' original petition.
17       (Defendants' Exhibit No. 5 was marked for
18   identification.)
19       THE WITNESS:  Yes, sir.
20   BY MR. HAYWARD:
21     Q.  Okay.  And the plaintiff's original petition
22   differs in parties; is that correct?  From the
23   intervener plea?
24     A.  Yes, sir.
25     Q.  Okay.  And do you recognize the parties who

Page 72
1   have hired or -- excuse me -- who have retained you in
2   this case to provide expert testimony?
3     A.  Yes, sir.
4     Q.  Okay.  Who would that be?
5     A.  Well, through counsel, Ms. Gomez.
6     Q.  Okay.  And her children?
7     A.  Yes, sir.
8     Q.  Okay.  Go ahead and leave those there.  So
9   I'm just going to ask you about this.  Did you use
10   these documents as factual information for any of your
11   opinions or occlusions that you made in your report?
12     A.  No, not -- when you say factual, there is
13   general reference in this incidence summary, which is
14   again in general.  Just set the stage -- the table,
15   some of that information has come from there.  Yes,
16   sir.
17     Q.  And I'm sorry.  I'm thinking this should be a
18   pretty simple question yes or no.  So if I'm not doing
19   something right, please let me know, and I'm happy to
20   rephrase it.
21       But did you use any of the information in either
22   one of these documents as factual information?  As
23   information that this -- what this says, you know
24   that's the truth in --
25     A.  (Indiscernible).



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
73—76

Page 73

1    Q. -- forming your opinion?
2    A. No, sir.
3    Q. Okay. You didn't use any of that as factual
4  information in forming your opinion?
5    A. On the assumption that it's the truth, no,
6  sir.
7    Q. Okay. Thank you. If you want, you
8  can -- actually, can you hand those back to me? I'm
9  going to show you some of the documents. I don't want
10  get myself confused.
11    MR. HAYWARD: This is going to be county
12  defendants Exhibit Number 6. It's a final autopsy
13  report.
14    (Defendants' Exhibit No. 6 was marked for
15    identification.)
16  BY MR. HAYWARD:
17    Q. Can you take a look at that, please?
18    A. (Indiscernible).
19    Q. Just let me know if that's the document that
20  you're referencing in your report.
21    A. Yes, sir. I believe it is.
22    Q. Okay. Regarding the final autopsy report,
23  okay, did you use any of this information as a factual
24  basis for your opinions and conclusions in this case?
25    A. Yes, sir. I did cite this information. Yes,

Page 74

1  sir.
2    Q. Okay. So you used information in there as
3  facts for which you formulated your opinions and
4  conclusions in your report?
5    A. I considered the information reliable and
6  factual based (indiscernible) the official report.
7    Q. Fantastic. And that's kind of what I'm
8  trying to just make sure I'm understanding here. So
9  would you agree with me there's clearly a difference
10  between the documents that you just reviewed, which is
11  the lawsuit that was filed by the intervener and the
12  plaintiffs, and the final autopsy report?
13    A. Yes, sir.
14    Q. Okay. As in, you look at this autopsy
15  report, and you have accepted that as being reliable
16  information?
17    A. I have. Yes, sir.
18    Q. Okay. I'm going to show you another exhibit.
19  This is county defendant's Exhibit Number 7.
20    (Defendants' Exhibit No. 7 was marked for
21    identification.)
22  BY MR. HAYWARD:
23    Q. If you could take a look at this and tell me
24  if this is a document that you referred to in your
25  report?

Page 75

1    A. Yes, sir, it is.
2    Q. Okay. The same question with respect to the
3  toxicology. Did you use the information in this
4  report as facts in coming to your opinions and
5  conclusions in your expert report?
6    A. Yes, sir.
7    Q. So would you also say that the information in
8  this report is reliable, as you also stated -- just
9  like you stated in your testimony regarding the final
10  autopsy report?
11    A. I have no reason to believe it's not
12  reliable.
13    Q. Okay. Is it reliable?
14    A. I -- I believe so.
15    Q. Okay. Thank you. I can take those back.
16  Thanks.
17    MR. ERWIN: (Indiscernible).
18    MR. HAYWARD: No. This is --
19    MR. ERWIN: Statements.
20    MR. HAYWARD: Well, actually, hold on a
21  second. Now that you say -- thank you. I didn't see
22  anything there.
23    MR. ERWIN: The stickers are over there.
24    MR. HAYWARD: Yeah. That's probably easier
25  (indiscernible). Can I use your marker real quick?

Page 76

1    THE REPORTER: I think you still have it.
2    MR. HAYWARD: Do I?
3    THE REPORTER: Yes. Somewhere.
4    MR. HAYWARD: That's okay. That's okay.
5  Okay.
6  BY MR. HAYWARD:
7    Q. Okay. I'm going to show you a document and
8  say it is defense Exhibit 8.
9    (Defendants' Exhibit No. 8 was marked for
10    identification.)
11  BY MR. HAYWARD:
12    Q. Do you recognize this as the document you
13  have listed here in your report as an expert report
14  prepared by David Turbay?
15    A. Yes, sir. I do.
16    Q. Okay. Did you use any of the information in
17  this report as the factual basis for providing your
18  opinions or conclusions in your report?
19    A. Yes, sir.
20    Q. Okay. Do you put this report on the same
21  level, as far as reliability, as the final autopsy
22  report and toxicology report?
23    A. Yes, sir.
24    Q. Okay. And I'm not asking you to change your
25  mind. I'm just going to ask you a follow-up question.



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
77—80

Page 77

1 Even though that this report was provided by another
2 retained expert in this case, and it gives opinions
3 regarding that experts viewpoint on the autopsy and
4 toxicology reports?
5     A. The -- all I can do is address -- address the
6 credibility of the report. It looks to be a credible
7 report with appropriate certifications. I find it to
8 be something that I would rely upon.
9     Q. Okay. Would you rely upon it in the same
10 exact way that you did for the autopsy report and
11 toxicology report, even though it is prepared by
12 another retained expert in this case?
13     A. For my purposes, yes. I understand the other
14 reports, I believe, might be official governmental
15 reports, and this is a private record, but I have
16 relied upon it as well.
17     Q. Okay. Can I have that back, please? Thanks.
18     And again, just to clear up any confusion. Do
19 you take this as being just as reliable as the autopsy
20 report and toxicology report, or is it maybe a
21 (indiscernible) slightly lesser degree?
22     A. I would consider it the same. Of course, I'm
23 not a medical expert, so I have to rely upon their
24 specialties.
25     Q. Okay. I'm going to show you what I have

Page 78

1 marked as exhibits or -- excuse me -- I'm going to
2 show you what I have marked as county Exhibit Number
3 9.
4     (Defendants' Exhibit No. 9 was marked for
5 identification.)
6     THE WITNESS: Yes, sir.
7 BY MR. HAYWARD:
8     Q. Okay. Is this the document that you have
9 referred to in your report as witness statement of
10 Robert Reyes?
11     A. Yes, sir.
12     Q. Okay. I'm also going to show you what's
13 marked as county Exhibit Number 10.
14     (Defendants' Exhibit No. 10 was marked for
15 identification.)
16 BY MR. HAYWARD:
17     Q. Is this document what you have referred to in
18 your report as a witness statement of Fidel, and in
19 parentheses (last name not listed)?
20     A. Yes, sir.
21     Q. Now, before I asked you the questions that
22 I've been asking you regarding these, I'm hoping you
23 can kind of help me with something here. So looking
24 at these statements, how did you acquire this
25 information?

Page 79

1     A. It was provided by counsel.
2     Q. Okay. I noticed that the document itself
3 looks like it's -- well, I'm sorry -- scratch that.
4     Can you please take a look at the one that's
5 titled first witness statements (indiscernible)
6 exhibit --
7     A. Yes, sir.
8     Q. Okay. Top left corner, it looks like there's
9 a staple. It looks like it's been a Xerox. It's a
10 Xerox sheet of some kind. Did it come to you looking
11 like that, or is that a result of you copying it at
12 your office?
13     A. No, sir. It's not a result of me copying it.
14 I can tell you that. I don't recall specifically
15 noticing that when I reviewed it, but I did not make a
16 copy.
17     Q. Okay. So did you get both Exhibits 9 and 10
18 from counsel?
19     A. Yes, sir.
20     Q. Okay. And was there any other information
21 provided to you regarding these two alleged witness
22 statements, or did they just or -- or did counsel just
23 give you these and ask you to look at them?
24     A. Yes, sir. It was just part of the case
25 materials.

Page 80

1     Q. Okay. Did you do any other independent
2 investigation as far as trying to determine the
3 veracity or the authenticity of these statements?
4     A. No, sir.
5     Q. Okay. Well, I'm just going to keep asking
6 you a couple more questions on this. So we have at
7 the very top, it says first witness statements, Robert
8 Reyes trustee and (indiscernible). So have you ever
9 met with Robert Reyes before, talked to him on the
10 phone, corresponded with him via email or mail?
11     A. No, sir.
12     Q. Okay. How about this individual that says
13 his name is Chris? There's no last name provided.
14 Did you ever talked with this particular individual,
15 Chris? Had you ever corresponded with them telephone,
16 email, other methods?
17     A. No, sir.
18     Q. Okay. Mr. Howse, what's, if anything, is the
19 significance of these witnesses statements and
20 including them in your report?
21     A. It was information included with the case
22 file, and they were witnesses, according to the
23 report. And I've cited such in my report, and I've
24 stated, you know, if true, my opinion.
25     Q. Right. So you're taking the position that



Page 81

1  these are, in fact, witness statements?
2      A.  The -- I think that's self-describing in the
3  content.  They are citing what they viewed.
4      Q.  I mean, are they, though?  This is a
5  conversation between two people that you've never
6  talked to before, and you have no idea where this
7  information came from?
8      A.  Witness statements do not necessarily have to
9  be -- we received witness statements on all kinds of
10  crimes and part of case files that, you know, you may
11  not talk to all of them.  That's --
12     Q.  Okay.  So not knowing where this information
13  came in, or how's information came in, you would say
14  what that this information is reliable for purposes of
15  making your expert report?
16         MR. PEREZ:  Objection.  Form.
17         THE WITNESS:  I can't assess credibility.  As
18  an expert, I can't weigh one piece of that another
19  or -- or give this more credibility than that, but it
20  is what it is -- what it states it is.
21  BY MR. HAYWARD:
22     Q.  Mr. Howse, as an expert, and I'm just
23  speaking generally, somebody contacts you and asks you
24  to do an assignment for them and gives you
25  information.  I mean, if you don't get enough

Page 82

1  information, do you call them back up and tell them,
2  hey, I don't have enough information can you give me
3  more?  I mean, is there a conversation that can happen
4  with respect to that?
5      A.  Yes, sir.  There is, and you'll see that I
6  note that in the report.
7      Q.  Okay.  But for purposes of what you're
8  calling witness statements, these witness statements
9  you did no follow-up whatsoever to confirm the
10  statements, to confirm what actually happened in the
11  statements, nothing like that?
12     A.  I've been advised that this is also a
13  criminal matter and that documents and video have not
14  been released.  So it would not make any sense to try
15  to obtain anything that has a hold on.
16         MR. HAYWARD:  Objection.  Nonresponsive.
17  BY MR. HAYWARD:
18     Q.  Okay.  Well, at least with respect to this
19  first witness statement -- I mean, I'm looking at the
20  top of it -- would you at least agree with me that it
21  looks like there's a part of this conversation that's
22  missing?
23     A.  I don't know that.  No, sir.
24     Q.  You don't.  So somebody that's been doing
25  this type of work for as long as you have where it

Page 83

1  starts out, just saying, somebody named Robert just
2  starts talking.  "They had already pepper sprayed him
3  in here in county.  They were laughing at how they
4  sprayed him and everything."  So information like that
5  just typically comes out of the blue.  No, hello, how
6  are you doing, what's your name, anything like that?
7      A.  No, sir.  I'm not concerned with the format.
8  I'm concerned that the fact that it -- it appears to
9  be a transcribed witness statement.
10     Q.  Okay.  Let's talk about that.  Who
11  transcribed it?
12     A.  I don't know, sir.
13     Q.  So how do you know it was transcribed witness
14  statement?
15     A.  By the nature of it.  It appears to be
16  a -- perhaps a phone call.
17     Q.  Right.  But you don't know that for sure, do
18  you?
19     A.  No.  I don't know that for sure.
20     Q.  Okay.
21     A.  I'm only looking at the facts of the
22  statement and whether that aligns with the other
23  things we do know for sure.
24     Q.  Right.  And we'll get into that in a minute.
25  But I guess my question is being answered here.

Page 84

1  You're just accepting whatever's in here as the truth.
2  Is that what you're saying?
3      A.  No, sir.  I didn't say that at all.
4      Q.  Okay.  But it doesn't concern you that
5  there's clearly pieces of information here -- even if
6  this was a witness statement that's not included here,
7  that doesn't concern you?
8      A.  I don't know that, sir.  I evaluated what was
9  provided to me and notated that in my report and also
10  cautioned the fact that these were not sworn
11  statements -- sworn witness statements, for instance.
12     Q.  Well, and I guess that's kind of my -- that's
13  kind of my concern here is because you thought enough
14  in your report to state that they were unsworn
15  statements, which means, at least to me, it would
16  appear that you did take into consideration the
17  authenticity of these things; am I correct?
18     A.  Not the authenticity, just the format of the
19  statement.  It appeared to be telephone-type call.
20  And, again, the -- the documents that I would
21  typically expect to see are apparently under seal.
22     Q.  So whether or not a document is
23  sworn -- excuse me -- whether or not testimony is
24  sworn or not, that's just the format issue to you.
25  That doesn't mean anything else?  That doesn't



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
85–88

Page 85

1  (indiscernible) itself to credibility or liability,
2  unreliability?
3      A.  Again, I -- I evaluate the evidence as
4  presented.  I cannot assign and say witness A is more
5  credible than the witness B.  That's for the trier of
6  fact.  I can review what is submitted to me and
7  include that with the caveats that I did.
8      Q.  See, that's kind of confusing to me because,
9  in your report, you are assessing -- you're making an
10  opinion as to fault as to people doing something they
11  should or shouldn't have done.  Okay.  And it appears
12  that you were relying on the information that's in
13  these statements to do that; is that true?
14      A.  I think I would use the term supporting.  My
15  opinion is not based -- you could take these out
16  totally, and my opinion would be the same.
17      Q.  Really?  Yes?
18      A.  Yes, sir.
19      Q.  Okay.  So for purposes of your report,
20  wherever (indiscernible) you've mentioned the
21  information that comes from these witness statements,
22  I can subtract that, and your report should stand on
23  its own; is that right?
24      A.  My opinions are based on the items listed in
25  the report.  It does include this.  It is supporting

Page 86

1  documentation.  I did not rely on these documents to
2  reach my opinion.
3      Q.  Okay.  Perfect.  That's what I'm trying to
4  figure out.  Okay.  So like I said, every time I read
5  your report where you make an opinion, and/or you
6  reference information that's in these statements, I
7  can subtract those out, and your expert report should
8  stand without that information, right?
9      A.  Yes, sir.  It -- it should stand in the sense
10  of once I've relied on it, I've relied on it.  It's
11  already -- I've already committed to it.  You could
12  remove it right now, but I still relied upon in -- in
13  my report.  I'm saying there's other evidence -- other
14  substantial evidence beyond just these statements.
15      Q.  Okay.
16      MR. HAYWARD:  Objection.  Nonresponsive.
17  BY MR. HAYWARD:
18      Q.  I'm following up with a statement that you
19  made.  You're the one that offered this
20  information.  You said you could take these statements
21  out, you know, I don't need them to reach the opinions
22  that I've made.  You said that, right?
23      A.  Yes.
24      Q.  Okay.  So that's correct.  I can rely on that
25  information from you, right?  I can rely on that

Page 87

1  statement from you?
2      A.  Yes, sir.  I think --
3      Q.  Okay.
4      A.  -- that -- that is true, but again, as I
5  said, having already relied upon them, it was included
6  in my report.
7      Q.  Okay.  Just to be clear, too.  I mean,
8  looking through this as well.  This first witness
9  statement, he says -- and again, I don't even know
10  who's talking here, so it's really -- I don't know who
11  these people are -- I don't even though if this
12  actually happened -- but there's something -- it says
13  in here -- and I'll rephrase.
14      Does it say in here -- does he ask the guy, hey,
15  what are you in there for?  What are your charges, if
16  you don't mind sharing?  What does he say?
17      A.  I'm sorry, sir.  Where are you at?
18      Q.  Sure.  I'm on this third page of this first
19  witness statement.
20      A.  Okay.
21      Q.  You read this, right?
22      A.  Yes, sir.  But I didn't --
23      Q.  Okay.
24      A.  -- read it today.
25      Q.  Okay.  He says, all right -- Chris says, "All

Page 88

1  right, man.  I don't know what you in there for.  What
2  are your charges if you don't mind sharing?"  Robert,
3  who's the alleged witness, he says, "Sexual assault of
4  a minor.  I got eight charges like that."  Do you see
5  that?
6      A.  Yes, sir.
7      Q.  Okay.  Did that have any impacts whatsoever
8  on assessing credibility of the information in here?
9      A.  None whatsoever.
10      Q.  None whatsoever?
11      A.  No, sir.
12      Q.  Okay.  So these statements in here that are
13  unauthenticated, unverified, unsworn, is this the same
14  as somebody who's swearing under oath and somebody
15  who's not in jail with eight charges of sexual assault
16  of a minor?
17      A.  Yes, sir.  A common witness to a accident or
18  a crime may have a criminal history.  That's not
19  relevant to that particular incident.
20      Q.  Even as a police officer for as long as you
21  have been, that doesn't mean anything to you in
22  assessing credibility of somebody telling you
23  something?
24      A.  I -- I'm not working this case as a police
25  officer in conducting an investigation.  I'm reviewing



Page 89

1  information that has been obtained, and as I've said,
2  I cannot assess that one --
3      Q. Okay.
4      A. -- person is more credible than the other.  I
5  can only base it on the information I've received.
6      Q. Would you at least agree with me that you
7  made no assessment regarding credibility or
8  reliability with respect to these witness statements?
9      A. I think that's correct.  I simply reviewed
10 the witness statements.
11     Q. Okay.  I'm good with that.  That's fine.
12 Okay.  So let's move on to this next one here.  Let's
13 see.  Where did I leave off?
14     THE REPORTER:  (Indiscernible) you're on 11.
15     MR. HAYWARD:  I'm on 11?
16     THE REPORTER:  Correct.
17     MR. HAYWARD:  Okay.  Thanks.
18 BY MR. HAYWARD:
19     Q. I can take this back now.  Thanks.  Take a
20 look at that please.  This is marked as county
21 defendant's Exhibit Number 11.  Appears to be a
22 newspaper article?
23     (Defendants' Exhibit No. 11 was marked for
24     identification.)
25     THE WITNESS:  Yes, sir.

Page 90

1  BY MR. HAYWARD:
2      Q. What's the significance of including this
3  document as a reference item in your report?
4      A. Simply that I -- I did reference or did view
5  the item.  So therefore, anything that I typically
6  view or read, I will include just to -- in the
7  interest of transparency.
8      Q. Okay.  So is it your testimony here today
9  that none of the opinions that you've made in your
10 report are based on any of the information that's in
11 this newspaper article?
12     A. Yes, sir.  That's correct.
13     Q. Okay.  I'll take that back.  Thanks.  You
14 reference a lot of statutes here.  The Texas Penal
15 Code, you know, can you tell me at least -- you don't
16 have to give me the number, but what are you referring
17 to in the Penal Code?
18     A. The reference is to Penal Code criminal
19 procedure of constitutions of U.S. and Texas.  Those
20 are just standard references that I've put in the
21 report because I may, from time to time, refer to
22 something in the report.  I don't believe I actually
23 cite a specific statute in the report, however.
24     Q. Okay.  So that actually would help me a great
25 deal because that way, we can move on to the report.

Page 91

1  But so the references from the Texas Penal Code all
2  the way down to the United States Constitution, these
3  are not really things that you relied upon.  These are
4  just things that you said that you just include in
5  your report?
6      A. Well, with the exception of the United States
7  Constitution.  I do specifically cite some Fourth and
8  First Amendment issues.
9      Q. You cited First Amendment issues in here?
10     A. Yes, sir.
11     Q. Okay.  And specifically about what or just
12 (indiscernible) on that so I can take a look at them.
13     A. With regard to --
14     Q. I wasn't aware this was a First Amendment
15 case, but where are you?
16     A. That would be regarding page -- page
17 9 -- let's see, that's -- yeah -- page 9 is where that
18 starts.  The first major paragraph there.
19     Q. Okay.  Is this a particular charge that
20 exists in this case?  Is somebody making an
21 allegation --
22     A. I believe that's -- again, that's involving
23 Yvonne Zamora --
24     Q. And just --
25     A. -- and her --

Page 92

1      Q. -- just to go back, though, we talked about
2  this earlier, but you're not acting as an expert in
3  this case for the intervener, Yvonne Zamora; is that
4  right?
5      A. I'm acting as an expert on the officer's
6  conduct, which involved both her and Mr. Zamora.
7      Q. Okay.  But as we stated before, they are two
8  separate parties in this case, and we've said as much.
9  There's an intervener, and there's a group of
10 plaintiffs, and you're retained by the plaintiffs?
11     A. Correct.
12     Q. Okay.  So is there something else I need to
13 know about?  Have you had communications with the
14 intervenors?
15     A. No, sir.
16     Q. Okay.  And again, so with regard to my first
17 question about the First Amendment, is this a charge
18 that you were asked to investigate in this case, or
19 did you just put this information here?  Did you come
20 up with this yourself?
21     A. I was asked to investigate the officer's
22 conduct and policy and procedure, and so it was
23 evaluated in that sense.
24     Q. What's your understanding of what kind of
25 case this is?  Would you classify this -- are you



Page 93

1  being asked to give an opinion on alleged excessive
2  force?
3      A.  That's part of it.
4      Q.  Okay.  So have you been asked to give an
5  expert opinion on whether or not there's a violation
6  of the First Amendment?
7      A.  Not specifically.  No, sir.  I -- at the
8  beginning of the report, states in the scope of what I
9  did and what I was asked.
10     Q.  Are you aware of there being any First
11  Amendment allegations anywhere in the pleadings that
12  you reviewed?
13     A.  Whether there is or -- well, yes, I believe
14  there was an assertion by plaintiff, Yvonne Zamora,
15  about her cell phone being confiscated.
16     Q.  Okay.  And she specifically said in there
17  that it was violation of her First Amendment Right?
18     A.  I don't recall.
19     Q.  Okay.
20     A.  I just know that it is --
21     Q.  (Indiscernible).
22     A.  -- as far as --
23     Q.  And then are you giving that opinion as an
24  attorney or --
25     A.  No.

Page 94

1      Q.  -- as an expert in law enforcement?
2      A.  No.  In violation of how law enforcement
3  officers are trained.  That they need a warrant to
4  seize a cell phone.  That's not a legal opinion.
5  That's how officers are trained.
6      Q.  Okay.  So not having a warrant to seize a
7  cell phone that's a First Amendment violation?
8      A.  Well, it's -- it's both.  It's Fourth, I
9  would say, and first, but again, that's a legal
10  opinion that -- for the trier of fact.
11     Q.  Right.  So whether or not there's a First
12  Amendment violation here, it's a legal opinion, right?
13  It's a legal conclusion?
14     A.  All of this is -- is subject to the the to
15  trial effect.  I've been asked to provide my opinion
16  based on my professional training and experience, and
17  I can tell you that peace officers, how they are
18  trained in those kinds of situations and what is
19  proper and not procedural wise.  It's not addressing
20  the legal issue.
21     Q.  Okay.  But you asserting that there's a first
22  amendment violation is a legal conclusion; is it not?
23     A.  No, sir.  I'm asserting that peace officers
24  receive training, that the public may record them as
25  long as they're not, you know, physically interfering

Page 95

1  with their duties.  That that's how peace officers are
2  trained.  And in fact, there is some codification to
3  that now in Texas, but I'm just addressing the
4  training of officers.
5      Q.  Objection.  Nonresponsive.  Okay.  So you
6  mentioned something in here, again, under some of
7  these documents.  You said, "Texas mission of law
8  enforcement course 3847."  What was course 3847?
9      A.  I believe that is excited delirium or crisis
10  intervention, one of the two.  They kind of overlap.
11  But I believe that's the excited delirium.
12     Q.  Is the excited delirium or is the other
13  one?
14     A.  I believe it's the excited delirium.
15     Q.  Okay.  Do you have a copy of this course?
16     A.  No, sir.  The -- when I prepared your
17  materials here yesterday, the TCOLE (ph) website that
18  depends all that was down and haven't been able to
19  obtain a printout, but certainly happy to do so.
20     Q.  Okay.  So you don't have a copy of the --
21     A.  Yes, sir.
22     Q.  All right.  How about the Texas Commission on
23  Law Enforcement Use of Force lesson plan and immediate
24  course?
25     A.  Yes, sir.  I sent an issue.

Page 96

1      Q.  Okay.  All right.  All right.  Then now, we
2  have this -- actually, I think it's in your
3  document's.  That's okay.  I've already -- I've
4  already labeled that packet as an exhibit.
5  This -- this Harris County office policy, 5/14 excited
6  delirium.
7      A.  Yes, sir.
8      Q.  Okay.  Why was this document included?
9      A.  Well, I listed it, again, as supporting
10  documentation to explain how peace officers are
11  trained.  Policy and procedure and -- and this
12  (indiscernible) shows embodiment of course as part of
13  it.  And Harris County is the largest service
14  department in Texas.  It's just a good resource.
15     Q.  Okay.  But you're not taking the position
16  that this particular policy is or has to be accepted
17  by all county sheriff departments, are you?
18     A.  I am stating that the Harris County policy is
19  representative of the training that officers are
20  provided and the policies that should exist.  But as
21  I've mentioned those policies haven't been provided.
22     Q.  Okay.  Are you saying that the Harris County
23  Sheriff's Office policy that you've brought for us
24  here is or has to be accepted by every department?
25     A.  No, sir.  I know of no requirement that would



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
97–100

Page 97

1  require that.

2      Q.  Yeah, yes or no is fine.  I appreciate it.

3  Okay.  On this next one, you say law enforcement code

4  of ethics.  Okay.  Why is this included in here?

5      A.  I decided in -- again, in the report what I

6  believe to be some deviances from the law enforcement

7  code of ethics that's part of -- all peace officers

8  receive that training in the academy.  They -- and

9  most departments have a doctorate, a Texas Commission

10  on Law Enforcement who license these officers and has

11  a doctorate as well as a guidance for officers.

12      Q.  Okay.  So -- all right.  Working our way down

13  now, we've got this incident summary, okay?  And what

14  I'm going to do here, because I've already read it.

15  I'm assuming, hopefully, you've already looked at it

16  over.  But I'd like for you to take a minute and just

17  look over this section real quick, okay?  Just the

18  section that says incident summary.

19      A.  Yes, sir.

20      Q.  And just look up when you're ready to talk

21  about it, please.

22      MR. HAYWARD:  You good?

23      UNIDENTIFIED VOICE:  Keep going.

24      MR. HAYWARD:  All right.

25      THE WITNESS:  Yes, sir.

Page 98

1  BY MR. HAYWARD:

2      Q.  Okay.  I'm going to hand you back Exhibit 3

3  here, okay?  And I'll just represent to you that this

4  is the City of Lyford incident report.

5      A.  Okay.

6      Q.  All right.  So is all the information in this

7  incident summary with the exception of the last

8  paragraph of this section, is all that information

9  coming from the City of Lyford incident report?

10      A.  No, sir.  Not all of it.

11      Q.  Okay.  What parts are not coming from that

12  incident report?

13      A.  Well, I state in the footnote there, at the

14  bottom of page four, that this is just to provide a

15  general understanding of the incident and that it's

16  based upon the incident reports and witness

17  statements.

18      Q.  Okay.  Did you read the -- I -- I -- I can

19  give you a little more time to read it if you want,

20  but I'm -- I mean, I'm happy to go through this line

21  by line with you.  I'm certainly not trying to trick

22  you, but it does appear that all of these paragraphs

23  with the exception of the very last paragraph under

24  this incident summary is, for lack of better words, a

25  copy, paste of the incident report from Lyford.

Page 99

1  That's why I gave you the Lyford report.  If it's not

2  true, let me know and I'll -- we'll go line by line.

3  That's fine.

4      A.  It's absolutely not a cut and paste.

5      Q.  Okay.  All right.  No problem.

6      A.  The details, they certainly are all specific

7  from -- from the report.

8      Q.  Okay.  So with regard to the -- let me ask

9  this a different way.  With the exception of the last

10  paragraph which is footnoted, the one that you pointed

11  out, are these other paragraphs, is this information

12  coming solely from the City of Lyford incident report?

13  I assure you, it's not a trick question.  It looks

14  like it's coming from the incident report to me, but

15  if there's something in there, look at it, it's not,

16  let me know.

17      A.  Yes, sir.  I think, like you said, that last

18  part excepted, off the top of my head, I'd say the

19  primary source was the incident report because that's

20  about the only source I have.

21      Q.  Okay.  Thank you.  I'm just -- like I said,

22  I'm just trying to get a baseline for the information.

23  Okay.  So with that being said, looking at this last

24  paragraph here, under incident summaries.  So now,

25  let's -- now, let's read this paragraph together,

Page 100

1  okay?

2      A.  Yes, sir.

3      Q.  All right.  It says, "Upon arrival at the

4  Willacy County Jail (ph), a witness, Robert Reyes, a

5  jail inmate trustee, observed Mr. Zamora to be in

6  medical distress after being pepper sprayed."  Is that

7  sentence -- is the information in that sentence coming

8  directly from the witness statements that we went

9  over?

10      A.  Yes, sir.  I believe it is.

11      Q.  Okay.  Then it says, "The witness also stated

12  he observed deputies laughing about having pepper

13  sprayed Mr. Zamora.  Mr. Reyes then observed jail

14  personnel were administering CPR to Mr. Zamora and

15  that he was naked.  The witness reported that he

16  believed Mr. Zamora was deceased but then an ambulance

17  arrived, and continued CPR, and transported Mr. Zamora

18  to a hospital where he was pronounced deceased."  Is

19  all of the information that I just read coming solely

20  from the witness statements?

21      A.  Let me just check one thing here.

22      Q.  Take your time.  Here.  Let me do this.  Here

23  is Exhibits 9 and 10.  These are the witness

24  statements.

25      A.  Yes, it is, except, I will say, in the Lyford



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
101–104

Page 101

1  report, Officer Garcia does state that the deputies
2  were taking Mr. Zamora to the county jail, but does
3  not state anything other than that.  And so there's
4  a -- just a little slight reliance upon the fact that
5  that's where they were going.
6      Q.  Okay.  But I -- I don't see anything in this
7  paragraph talking about transporting somebody to jail.
8  I mean, I -- we can be as hyper-technical about this
9  if you want.  I'm just trying to -- it appears that
10  this last paragraph and the information comes solely
11  from your witness statement.
12      A.  Well, I discuss that later in the report,
13  so -- but the --
14          MR. HAYWARD:  Okay.
15          THE WITNESS:  this is just your general
16  summary, a general incident summary that you have to
17  agree to -- you know, for the case.  It's not intended
18  to list every fact.
19  BY MR. HAYWARD:
20      Q.  Got it.  I didn't ask you that, sir.  Do you
21  understand that?  We're going line through line
22  through your report and what's going to determine if I
23  have to go through sentence by sentence is
24  cooperation, okay?  So if I'm asking you a question
25  that's not making sense to you or you need me to

Page 102

1  rephrase, you know, please let me know, okay?  Because
2  this -- I haven't even gotten to your opinions yet and
3  we're starting on this last paragraph, and all I'm
4  trying to ask you is, is the information in this last
5  paragraph of the incident summary coming solely from
6  the witness statements?
7      A.  And I answered no because there's a piece
8  coming from the City of Lyford report that implicates
9  the county jail.
10      Q.  Okay.
11      A.  So I think I've answered your question,
12  Counsel.
13      Q.  Other -- okay, fine.  Other than the City of
14  Lyford incident report and the witness statements, is
15  there anything else that you pulled from for this
16  paragraph?
17      A.  No, sir.  Not off the top of my head.  I
18  believe it's primarily, again, from the lack of the
19  incident report.
20      Q.  Okay.  Jumping down to scope of review, it
21  says, "The scope of nature of this report is to
22  provide an independent evaluation of the conduct of
23  Officer Garcia, Deputy Vargas, Deputy Silva and Deputy
24  Revus (ph) as well as the Lyford Police Department and
25  Willacy County Serrif's office to determine whether

Page 103

1  their actions training supervision or policies,
2  procedures were consistent with professional standards
3  and generally accepted practices of the law
4  enforcement profession."  Do you feel that you've
5  reviewed sufficient facts and data to be able to
6  deliver an opinion as to that statement?  Just the
7  information that you have in that statement.
8      A.  To prepare a preliminary report, yes, sir.
9      Q.  All right.  Preliminary report.  Okay.  Do
10  you believe that this report gives -- or excuse me.
11  Scratch that.  Do you believe that you've reviewed
12  sufficient data and facts to make a determination and
13  as to the differences, if any, that occurred with the
14  law enforcement involvement between the City of Lyford
15  and the Willacy County Sheriff's Department?
16      A.  Differences?
17      Q.  Yes.
18      A.  That's what you're asking?  Differences with
19  regard to the officer's conduct?  Is that the
20  question?
21      Q.  That's -- that's what you're opining on.
22      A.  Well, I -- I do separate Officer Garcia from
23  the deputies with regard to their conduct, but much of
24  the conduct appeared to be similar in nature from my
25  concern.

Page 104

1      Q.  Okay.  Okay.  And just -- and just for
2  purposes of clarity, at the bottom of page four here,
3  you -- there's a bunch of block quotes -- or excuse
4  me.  There's a block quote that starts at the bottom
5  of page four, goes to the next page, goes all the way
6  through to the end of that page.  This isn't an
7  opinion, right?  This is you signing or providing
8  information under these different -- what -- what is
9  it -- the United States Constitution and the Law
10  Enforcement Code of Ethics, right?
11      A.  Well, this -- this first one is the fourth
12  amendment, that's the Constitution.  And again, just
13  showing that officers receive training in this, and
14  the academy, and throughout their career.  And then I
15  also mentioned -- the next block quote is the State of
16  Texas Oath that all peace officers take and
17  that's -- then the last one is the Law Enforcement
18  Code of Ethics.
19      Q.  Okay.  But this -- this section is not an
20  opinion that's made by you?  This is you --
21      A.  It's used to form a basis of my opinion.
22      Q.  Okay.  But it's not an opinion that you're
23  living; is that right?
24      A.  I don't offer an opinion on the Constitution
25  or --



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
105–108

Page 105

1    Q.  It's just a yes or no question.  I'm just
2  trying to move forwards.  Okay, thanks.  Okay.  So
3  page six.  So now, I'm getting into, it looks like the
4  beginning of your opinions.  It says, "The analysis of
5  the use of force, slash, deadly force against Mr. John
6  Ray Zamora."  Okay.  So under this heading, I want to
7  start here.  It says, "This evaluation of the use of
8  force, slash, deadly force against Mr. Zamora is based
9  upon evidence submitted thus far for review.  It is
10  extremely important to recognize that video evidence
11  of the incident is acknowledged to exist."  Okay.  I
12  want to ask you about that real quick.  So is it fair
13  to say that when you wrote this report, you know, it
14  had been made known to you that there was other
15  information out there that could assist and providing
16  an opinion.
17    A.  Yes, sir.
18    Q.  Okay.  And that's your understanding here
19  that the information out there that could assist is,
20  as you put it, video evidence of the incident?
21    A.  That's my understanding.
22    Q.  Okay.  And at this point, you're writing a
23  report though you don't have that and you don't have
24  anything else really other than the Lyford incident
25  report?

Page 106

1    A.  Well, and the witness statements and -- and
2  that I relied upon.  But no, sir, I don't have any
3  other video evidence at all.
4    Q.  Okay.  I'm going to jump down here and under
5  sentence, it says, "Therefore, significant and
6  relevant evidence has been unable to be reviewed for
7  this report."  Do you see where it says that?
8    A.  Yes, sir.
9    Q.  I mean, we've been kind of talking, it's kind
10  of been the theme here during these questions -- you
11  know, it appears to me that you've identified the fact
12  that you have not reviewed significant and relevant
13  evidence for purposes of making this report; is that
14  correct?
15    A.  No, sir.
16    Q.  Okay.  So what does this sentence mean?
17    A.  It means that there is significant and
18  relevant evidence that had not been submitted yet.
19  It's not at all addressing the -- the evidence I have
20  reviewed, I don't consider significant or not relevant
21  because it is.
22    Q.  Okay.  So for purposes of this report, you're
23  not stating here that you need additional information
24  to make your opinions, to support your opinions here?
25    A.  I've stated I have sufficient information to

Page 107

1  write a preliminary -- preliminary report that
2  includes my opinions on what I have thus far.
3    Q.  Okay.  Let's -- let's keep going.  So it
4  says, "Such evidence must be reviewed in order to
5  conduct a full and independent evaluation of the use
6  of force by the peace officers or other personnel
7  involved in this incident."  So you say independent
8  evaluation.  So is this report not an independent
9  evaluation?
10    A.  No, sir.  It's all an independent evaluation
11  as I stated earlier in the report, that's my purpose.
12  I don't work for either parties.
13    Q.  So what is the purpose of providing the
14  sentencing?
15    A.  It's addressing the video and -- and/or body
16  camera and/or state yield camera, incident reports
17  from Willacy County, jail reports, deputy incident
18  reports.  All kinds of information that has not been
19  submitted, which would typically be submitted when
20  you're evaluated in a use-of-force situation,
21  including this force report.
22    Q.  Okay.  But why would you write a sentence
23  that says, "Such evidence must be reviewed in order to
24  conduct a full and independent evaluation of the use
25  of force by the peace officers or other personnel

Page 108

1  involved in this incident."  Because that at least
2  appears to say that you don't have enough and you
3  haven't been able to make a full and complete
4  independent evaluation.
5    A.  But that's not what I've said.  That simply
6  to restate an earlier statement, that I have made an
7  independent evaluation, this is my preliminary expert
8  report, subject to that issue right there.
9    Q.  How is it a restatement if you're saying that
10  you need evidence to conduct a full and independent
11  evaluation of use of force?  How is that a restatement
12  of you saying you have sufficient evidence?
13    A.  I have sufficient evidence for a preliminary
14  report and I've stated it several times.  I do not
15  have --
16        (Crosstalk.)
17    Q.  I don't think you really described
18  what -- like the difference between a preliminary
19  report and an actual report.  I guess maybe that's
20  where I'm getting lost in translation.  So are you
21  saying that as an expert, you're allowed to make an
22  expert report or call it an expert report, but include
23  very little information and just make an opinion
24  that's not based on fact so long as you have the
25  ability to look at something in the future and come



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
109—112

Page 109

1  back and amend your opinion; is that what you're
2  saying?
3      A. No, sir. I've given you an expert report
4  citing the sources that I relied upon, in addition to
5  my professional experience and training, and I
6  prepared, have sufficient information as I stated
7  previously, to prepare a preliminary report being that
8  the kinds of things that are normally submitted for
9  case review have not been released by Willacy clients.
10     Q. Okay. And that's -- okay. Well, let's talk
11  about that for a second here. So I know you've
12  mentioned that a couple of -- a couple of times.
13  Something hasn't been released, something hadn't been
14  released. But you're -- you're an expert and you've
15  said that you operate independent, right? Like I
16  could call you and ask you for services, he can call
17  you and ask you for services, right?
18     A. Yes, sir.
19     Q. You don't just take on cases for plaintiffs
20  or only, right?
21     A. Yes, sir. Phone rings --
22     Q. Okay.
23     A. -- I pick it up.
24     Q. But as -- but as an expert and being somebody
25  that's been doing this for so many years, I mean, it's

Page 110

1  kind of your duty to review the evidence and make a
2  determination whether you have enough to write a
3  report. You're respective of what somebody's
4  deadlines are per your respective of whether or not
5  that information is available, you still have a duty
6  to inform somebody, I have enough or I don't have
7  enough to make a report; is that right?
8      A. Yes, sir. I believe I had enough.
9      Q. And you believe you have enough despite
10  repeatedly stating that you don't have significant
11  information to make a full and independent evaluation?
12     A. To make a full report. This is a preliminary
13  report based on the information and evidence submitted
14  thus far and all of my professional training and
15  experience with these kinds of incidents.
16     Q. And you -- I just -- I'm sorry, but you keep
17  saying preliminary. Where -- where in your
18  understanding of the law as an expert does it say that
19  there's a difference between a preliminary -- like a
20  preliminary expert report and an expert report?
21     A. Well, perhaps it would be better read if this
22  was report number one.
23     Q. Okay. So as you sit here though, you are
24  expecting your report to change; is that what you're
25  saying?

Page 111

1      A. I'm saying I'm aware that there is
2  significant evidence that I would typically review
3  that has not been submitted for review. And with all
4  of my reports, I've looked, completed with I've
5  observed the rights in modifying my opinion based on
6  new evidence submitted.
7      Q. No, I -- I understand that. I just -- I'll
8  represent to you this is probably the first time I've
9  seen it when you said so many times in the report that
10  you don't have access to information and that you
11  don't have enough information to make a full and
12  independent evaluation. I'm trying to figure out how
13  I'm supposed to understand it and what you're telling
14  me is not making very much sense to me. Can you at
15  least respect that?
16     A. Yes.
17     Q. Okay.
18     A. As I said, if it helps, I'd just call it
19  report number one. If additional information is
20  submitted, certainly, I'll do us up another report
21  considering that information.
22     Q. But again, as we talked about earlier, in
23  order to make a supplemental report or an amended
24  report, you would agree with me that this report in
25  and of itself has to withstand the scrutiny of the

Page 112

1  requirements for making an expert report?
2      A. Absolutely.
3      Q. Okay. All right. This next part of the
4  report here, this is -- it says Officer Salvador
5  Garcia. What department is he with?
6      A. City of Lyford.
7      Q. Okay. Okay. I'm going to go ahead
8  and -- I'm going to move past this section for now and
9  give Mr. Erwin a chance to ask you about that, if he
10  chooses.
11     MR. ERWIN: Because right now, the written
12  spot for -- for break. If you want to apply that
13  break.
14     MR. HAYWARD: Sure. Let me -- let me make a
15  note for that.
16     MR. ERWIN: Absolutely.
17     MR. HAYWARD: Let's see. Yes, sir. That's
18  good with me. Would you like to take a break?
19     THE WITNESS: That's fine with me, I believe.
20     THE VIDEOGRAPHER: We are off the record at
21  12:40. End media one.
22     (Off the record.)
23     THE VIDEOGRAPHER: We're on the record at
24  12:50. Start media two.
25  BY MR. HAYWARD:



Page 113

1    Q.  Okay, Mr. Howse.  To kind of pick up where we
2  left off here, we had just gotten to the section
3  regarding Officer Salvador Garcia and I think you told
4  me that Mr. Garcia -- or excuse me, Officer Garcia,
5  it's your understanding that he is an officer with
6  Lyford PD; is that right?
7    A.  Yes, sir.
8    Q.  Okay.  And I think -- it looks like you've
9  kind of written this report because you have a section
10  here where you talk about Officer Salvador Garcia's
11  involvement, as you understand it, to be in this
12  incident and then there's another section after that
13  where it's entitled, general discussion of officers,
14  actions on the scene; is that right?
15    A.  Correct.
16    Q.  Okay.  So -- so I'm going to -- I'm going to
17  move past Officer Garcia's section for now and I'm
18  going to go down to where it says general discussion
19  of officers, actions on the scene.  That's on page
20  number seven.  Okay?
21    A.  All right.
22    Q.  All right.  So just kind of move down here
23  real quick, this first statement.  It says, "Based
24  upon the evidence as thus far presented, the following
25  opinions and conclusions are reported and attributed

Page 114

1  to Officer Garcia, Deputy Vargas, Deputy Silva and
2  Deputy Revus, officers in the aggregate as details as
3  to each specific officer's actions have yet to be
4  submitted.  Okay.
5        So this part of this here where you're saying
6  that the details as to each specific officers' actions
7  have yet to be submitted.  Can you just -- can you
8  just let me know, are the opinions that you're making
9  here, are they based upon the officer's actions as you
10  put it, in the aggregate or are you able to actually
11  decipher which officer did what alleged excessive
12  force?
13    A.  As we discussed, primarily based upon the
14  official incident report, so Lyford PD, and have not
15  been able to quantify specific individual issues other
16  than Officer Garcia.  Since we do have a report from
17  him, but as ai mentioned earlier, we don't have use of
18  force reports or body cam, or vehicle cam, or any sort
19  of document from Willacy County yet.
20    Q.  Okay.  So would it be fair to say that the
21  opinions as to Willacy County are made in the
22  aggregate and not as to the individual officers that
23  were involved?
24    A.  With regard to -- yes, based on the City of
25  Lyford report.

Page 115

1    Q.  Okay.  All right.  So this -- okay.  This
2  second paragraph here under general discussion,
3  officers' actions -- all right.  You put down your
4  plaintiff is Yvonne Zamora.  It serves that she
5  observed the officers using physical force against Mr.
6  Zamora in the front yard.  When you refer to plaintiff
7  or Yvonne Zamora, just to be clear, are you referring
8  to a conversation you had with her or are you
9  referring to information that was contained in her
10  plea immunity?
11    A.  I'm -- I'm referring to the plea and have not
12  had any personal conversation.
13    Q.  Okay.  Okay.  And it says this force included
14  hands-on physical force as well as the use of pepper
15  spray and taser in order to restrain Mr. Zamora.  And
16  then you say, "If true, such use of force is excessive
17  in nature and outside of the scope of generally
18  accepted policy practices and procedures when
19  attempting to provide assistance to a person who is
20  acting aggressive due to a drug interaction."  Okay.
21  So again, first and foremost, when you say -- when you
22  say in your report, you say, "If true,"  so I -- is
23  it -- can I take the position here reading this that
24  this information that you have here is not necessarily
25  being viewed at by you as a fact?

Page 116

1    A.  As a -- that's correct.  I've not received
2  Willacy County related documents.
3    Q.  Okay.  All right.  So when you say
4  here -- when you say here, you make this statement
5  that such use of force is excessive in nature and
6  outside of the scope, you're basing that opinion off
7  of this information that you're getting from Ms.
8  Zamora in her plea; is that right?
9    A.  No.  I'm basing it off of the City of Lyford
10  report.
11    Q.  Oh, okay.  All right.  Let's see.  Hold on.
12  Let me see.
13    A.  Well, let me --
14    Q.  I was going to say -- because I think there's
15  a lot of statements you're making that aren't
16  contained I this --
17        (Crosstalk.)
18    A.  Yeah, I don't -- actually, you were asking
19  about just the phone, correct?
20    Q.  No, sir.  I'm -- I'm asking -- we're talking
21  about this second paragraph here under the general
22  discussion of the officer's actions.  Specifically,
23  you say, "This force includes hands-on physical force
24  as well as the use of pepper spray and taser in order
25  to restrain Mr. Zamora."  And then the next sentence



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
117–120

Page 117

1  is, "If true, such use of force is excessive in nature
2  and outside the scope."  So it sounds to me like
3  you're using the information from Ms. Zamora's plea
4  and then making the statement, if that's true, then
5  it's excessive force.
6       A.  Thats piece from Ms. Zamora, but the use of
7  force is listed in the City of Lyford report.
8       Q.  Okay.  Let me go back and look at that.
9            MR. HAYWARD:  Where is that?  Sorry.  Did
10  I --
11           UNIDENTIFIED VOICE:  Oh, you're --
12               (Crosstalk.)
13           MR. HAYWARD:  Can I see that real quick?
14  Thanks.
15  BY MR. HAYWARD:
16       Q.  So it's from this report that you're getting
17  the information that you need to say that there was an
18  excessive use of force?
19       A.  The -- the -- that there was a use of force,
20  number one and the circumstances under which the force
21  was used.
22       Q.  I'm sorry.  This is -- I'm looking at Exhibit
23  3.  This is the City of Lyford incident report.  So
24  I'm -- I'm looking at that.  I don't necessarily see
25  the specific uses of force that you're referring to in

Page 118

1  this paragraph, in that report.  I could be wrong,
2  but --
3       A.  It states that --
4       Q.  What does it say about pepper spray?
5       A.  I don't think it was just pepper spray.
6       Q.  Okay.
7       A.  It is stating that the deputies of Willacy
8  County had Mr. Zamora on the ground and were wrestling
9  with him essentially.  And that Officer Garcia
10  assisted them in the arrest and in the -- while
11  he -- presumably, while he was on the ground and with
12  the deputies.
13       Q.  Okay.  So from that report, it sounds like
14  that's talking about what you refer to as hands-on
15  physical force; is that right?
16       A.  Yes, sir.
17       Q.  Okay.  Does that report address the remainder
18  of your opinion here regarding use of pepper spray and
19  taser?
20       A.  I believe when you say address, that is, I
21  believe, from pleadings asserted that there were -- he
22  was pepper sprayed and tasered.  I don't have, as I
23  mentioned, the use-of-force reports --
24       Q.  Right.  And I'm -- I know you -- I know you
25  want to keep referring to, you know, the items that

Page 119

1  you're saying that you don't have.  I'm really trying
2  to -- I'm really trying to get through this report and
3  just make a determination as to what the support you
4  have -- you reviewed in getting to these opinions on
5  this report, okay?
6       A.  Sure.
7       Q.  All right.  So for purposes of what you're
8  saying here, you know, other than the hands-on
9  physical force, is the other information you're
10  getting coming from the plea and the intervention or
11  the plaintiff's petition?
12       A.  No, sir.  The report, the City of Lyford
13  report, clearly sets forth, I presume, to be true,
14  it's official report, that what Officer Garcia saw and
15  encountered when he arrived, he immediately knew that
16  it was a drug-related incident and reported suspicious
17  behavior that Mr. Zamora was exhibiting.  And then
18  subsequent to that, it gets into the deputies arriving
19  at the same scene and he goes on in a little more
20  detail, but no, I obtained all of that information
21  from the City of Lyford report.  That tells me what
22  the call was, what the officer saw.
23       Q.  Okay.
24       A.  And then what happened afterwards.
25       Q.  Okay.  So I'm just -- I'll see if I can ask

Page 120

1  this a different way.  Does that report that you're
2  looking at, the City of Lyford incident report, talk
3  about who used pepper spray, or who used a taser, or
4  if pepper spray, or if a taser was used?
5       A.  No, sir.
6       Q.  Thank you.  Okay.  So this next sentence
7  here, we -- we go down.  It says, "Peace officers are
8  not trained to use punitive or excessive physical
9  force against a person's experience drug-related,
10  medical emergencies."  Okay.  So what evidence do you
11  have that you've reviewed that Mr. Zamora, at the
12  moment in time you're stating there was a use of
13  force, was experiencing a medical emergency?
14       A.  The City of Lyford report.
15       Q.  Okay.  So City of Lyford report, in your
16  opinion, states that he was experiencing a medical
17  emergency and he needed to go to the hospital?
18       A.  No, sir.  Based on my professional training
19  and experience in reading the report, it described a
20  situation that is a medical emergency based on my
21  professional training and experience.  It does not
22  cite that specifically in the report.
23       Q.  Okay.  And that's what I'm asking.  I
24  appreciate it.  And so the statement here you make
25  about using punitive or excessive physical force, when



Page 121
1  you make that statement, are you lumping in, not only
2  what you're referring to as the hands-on physical
3  force, but also the use of pepper spray and the use of
4  the taser?
5      A.  Not specifically.  I'm primarily relating to
6  the -- to the hands-on physical force due to the
7  nature of the medical emergency.
8      Q.  Your opinion that there's a medical
9  emergency, right?
10     A.  It's based on my professional training and
11  experience, it meets the criteria for an excited
12  delirium medical emergency requiring EMS.
13     Q.  Right.  But it's your opinion it's not stated
14  in the report that there was a medical emergency?
15     A.  In fact, it's not and prodigal of that, the
16  officer failed to recognize that it was a medical
17  emergency.
18     Q.  Okay.  Excited delirium, it's my
19  understanding that that is not a -- and correct me if
20  I'm wrong, but it's my understanding that that's not a
21  clinically accepted diagnosis.
22     A.  I'm not a clinician or medical practitioner.
23  I can tell you there are discussions that are held and
24  are bandied back and forth with regard to the
25  legitimacy which they have -- of that diagnosis, but

Page 122
1  there is no discrepancy at all with regards to the
2  policy procedure or policies.
3      Q.  Okay.  So excited delirium is an -- well,
4  you're saying it's a diagnosis, correct?
5      A.  I'm not saying that it -- I'm not offering
6  any medical opinion.  I don't know that it's a
7  diagnosis or not.  I can only tell you police officers
8  are trained on the concept of excited delirium.
9      Q.  Okay.  Is it your testimony here today that
10  police officers are trained to like various objective
11  facts in determining whether or not somebody's
12  experiencing excited delirium at all times, in all
13  cases?
14     A.  Well, every case is different, but
15  there -- there are a repetitive set of facts and
16  circumstances that are consistent with an excited
17  delirium incident or something similar.
18     Q.  Right.  but you're making -- you're making
19  this assumption based on this one report; is that
20  right?
21     A.  No, sir.  The medical reports state that is
22  a -- is a condition and that Mr. Zamora had drugs in
23  his system.  Basing that on the City of Lyford report
24  as well, based on the officer's observation of Mr.
25  Zamora's actions and then his own stated actions.

Page 123
1      Q.  All right.  You said earlier that you had
2  made some arrests in the past for public intoxication?
3      A.  Yes, sir.
4      Q.  Okay.  And in your opinion, is it possible to
5  have an arrest of public intoxication and have
6  somebody be exhibiting excited delirium and an officer
7  either not recognize that or not make that
8  determination?  Or is this something that you're
9  saying every officer, all the time, should be able to
10  make this determination?
11     A.  Well, generally speaking, public intoxication
12  is not the primary indicator for this kinds of
13  situations.  It's more drug induced.  So -- so that's
14  kind of a big difference there.  And Officer job
15  trained specifically, on the behavior to be on the
16  lookout for it.
17     Q.  Okay.  So public intoxication, in your
18  opinion, doesn't include drug use?
19     A.  I think generally, it is alcohol abuse when
20  we refer to that term more often than not.
21     Q.  There's a penal code charge for public
22  intoxication, is there not?
23     A.  Yes, sir.
24     Q.  Okay.  Does the charge for public
25  intoxication only refer to or does it separate

Page 124
1  differences between somebody being intoxicated with
2  alcohol or somebody with marijuana?
3      A.  I'd have to review the statute, but I believe
4  it may include intoxication in general.
5      Q.  Okay.  Excuse me.  Okay.  At the bottom of
6  this page, on page seven, you refer to something
7  called the -- pardon me.  Sorry.  The International
8  Association of Chiefs of Police, The IACP and it
9  offers the following training and policy
10  guideline -- or excuse me.  Policy guidance to all
11  peace officers.  So this appears to be, I guess
12  a -- like a write-up on excited delirium; is that
13  right?
14     A.  Yes, sir.
15     Q.  Okay.  And I'm not -- I'm not familiar with
16  this organization, but is this -- is this something
17  that has been directed to be included, you know, as a
18  mandatory training or a mandatory policy for all
19  departments?
20     A.  The IACP provides model policies and guidance
21  to police departments across the world.  It's the
22  largest law enforcement management, we'll say,
23  association in the world.
24     Q.  Okay.  So let's move to page nine.  Oh, by
25  the way, are -- are you making an opinion in this



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
125–128

Page 125

1  report or here today as to which officers on the scene
2  should have noticed that there was excited delirium
3  going on?
4      A.  Because all peace officers are trained in
5  excited delirium, it is a mandate by the Texas
6  Commission on law enforcement, I've -- my opinion is
7  all of the officers on scene, regardless the agency
8  should have been aware.
9      Q.  Okay.  So given the information that you've
10  reviewed and that you have at your disposal right now,
11  do you feel that you have enough information to make
12  that opinion, that all officers on the scene, despite
13  where they were, how they were interacting, despite
14  the behavior of the decedent, that all of the officers
15  should have recognized that there were excited
16  delirium?
17      A.  Yes, sir.
18      Q.  Okay.  Okay.  The top of page nine says,
19  "Plaintive Yvonne Zamora also asserts that upon
20  observing the officers' use of physical force against
21  Mr. Zamora and hearing cries from Mr. Zamora for help,
22  she took her cell phone from her pocket and started to
23  video the officers' actions."  Okay.  I'm going
24  to -- I'm going to keep reading through here a little
25  bit and then I'll ask you about it.  "Plaintiff Zamora

Page 126

1  asserts an officer, unnamed, then approached her and
2  confiscated her cell phone and placed her in
3  handcuffs."
4      Okay.  So with respect to the use of force issues
5  in this case that you were asked to deliver an
6  opinion, what is the significance of these two
7  sentences?
8      A.  Oh, that's for not only use of force, but
9  police procedure, arrests (indiscernible).
10      Q.  Okay.  So you were -- but you were -- just to
11  be clear, your assignment was to review everything to
12  include the arrest of Ms. Zamora?
13      A.  The incident in general.
14      Q.  No, specifically, with respect to Ms. Zamora,
15  you were asked to --
16          (Crosstalk.)
17      A.  No, I was asked to review the incident.
18      Q.  Okay.
19      A.  The officers' conduct and that was part of
20  their conduct.
21      Q.  With respect to Ms. Yvonne Zamora, were you
22  asked specifically to give an opinion as to whether or
23  not her arrest involved any type of excessive force?
24  Specifically.
25      A.  I was not specifically asked about her.

Page 127

1  Again, I was hired to --
2      Q.  Thank you.
3      A.  -- evaluate the incident.
4      Q.  All right.  So the next part of this says,
5  "If true," -- again, there's the if true.  It says,
6  "Such conduct is outside the scope of generally
7  accepted police practices and procedures."  So this
8  first part of this paragraph, is this information
9  coming from the information that's in Mr. Yvonne
10  Zamora's plea and intervention?
11      A.  Yes, it is and that's why it stated it's
12  asserted by her.  And I put the caveat if true.
13      Q.  Right.  So if I see something in this report
14  that says, if true, can I rely on the fact that that
15  information is coming from something like the lawsuit
16  or something that you have stated is not reliable?
17      A.  It means I don't believe I have sufficient
18  documentation yet submitted to confirm or deny.
19      Q.  Okay.  And again, let's -- the rest of this
20  part here, I think we've already talked about this.
21  I'm not going to go over this again, but the end is
22  talking about the seizure of the cell phone specific
23  to Ms. Zamora.  The only question I'll ask you about
24  this is, this is not in relation to the use of force
25  that's allegedly occurring as to the decedent, right?

Page 128

1  Or that you're talking about specifically, the
2  interactions with law enforcement and Ms. Yvonne
3  Zamora?
4      A.  Yes, strictly any use of force and/or
5  aggressive procedure excluding Mr. Zamora.
6      Q.  Okay.  And then I'm going to skip this block
7  quote here.  The next part says, "No evidence has thus
8  far been presented to suggest that Ms. Zamora was
9  interfering with the officers.  Ms. Zamora asserts she
10  was attempting to document excessive force being used
11  against her son, Mr. Zamora."  Okay.  So I mean,
12  again, is -- this is you just basically saying, you
13  got -- you're getting this information from the plea
14  and the intervention, you haven't had an opportunity
15  to look at the other side of the story?
16      A.  Yes, it's a continuation of the paragraph
17  above.
18      Q.  But am I correct in saying that?
19      A.  Yes, sir.
20      Q.  Okay.  Okay.  This next part, General
21  discussion of officers' action at Willacy County Jail.
22  Okay.  But before I get into this section, is there
23  anything else I need to know about that you would have
24  reviewed with respect to the officers' actions at the
25  Willacy County Jail other than the witness statements?



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
129–132

Page 129

1    A.  No, sir.  That statement hasn't been
2  submitted yet.
3    Q.  Okay.  This is very important, okay?  So I
4  need to make sure I'm asking this properly.  So even
5  to the extent that you reviewed the plaintiff's
6  lawsuit and the plea and the intervention, is all the
7  information under this section that talks about
8  general discussion of officers' actions at Willacy
9  County Jail coming from the witness stance?
10    A.  Yes, plus there is mention there generally
11  from the plaintiff as sort of, you know, the physical
12  injuries and -- and -- and being beaten at the jail.
13  So it's not strictly from the witness.  It's -- it is
14  pulled from a couple of different areas.
15    Q.  Perfect.  So let's -- like this is why I
16  asked the question, okay?  So I need to make sure I'm
17  understanding all of the documents that you reviewed
18  for purposes of making the opinions under this
19  particular section, which is general discussion of
20  officers' actions at Willacy County Jail.  So, so far,
21  we have the witness statements, we have Plaintiff's
22  original petition, right?  There's at least some
23  information that's been taken from?
24    A.  Yes, sir.
25    Q.  Okay.  How about the plea and intervention?

Page 130

1  Is there --
2    A.  Yes --
3    Q.  -- some -- okay.
4    A.  Yes.  In the earlier part of --
5    Q.  Anything else that I'm missing as far -- hold
6  on.  As far as factual information that you're
7  referring to, to make the opinions in this section?
8    A.  The newspaper article we referred to earlier,
9  the Valley Star, which I assume the paper record,
10  generally, considered those to be reasonably reliable
11  documents and that -- and that cites some of that
12  information.
13    Q.  Okay.  So you're -- are you saying that the
14  newspaper article now is reliable information that
15  you've relied on?  Because I'm -- I'm pretty sure -- I
16  mean, I'd have to look, but I'm pretty sure that you
17  had told me earlier that that was not reliable
18  information.  We went through all of the documents.
19    A.  I don't think I said it was not reliable.
20    Q.  Okay.
21    A.  If I've listed it here as a document that I
22  read --
23    Q.  Yes.
24    A.  -- and -- and it states about the criminal
25  charges that they considered and to that extent, it

Page 131

1  supports what has already been --
2    Q.  So you're saying that this article talks
3  about the criminal charges that are going to be
4  brought?
5    A.  I don't know if they're going to be brought
6  or not.  I'm just saying it discusses it.
7    Q.  Okay.  What specifically does it discuss
8  regarding criminal charges?
9    A.  That -- that Willacy County DA is considering
10  criminal charges against the deputies for the death of
11  Mr. Zamora.
12    Q.  That's what this article says to you?
13    A.  Yes.
14    Q.  Okay.  This article sent to you says the
15  Willacy County DA is considering criminal charges?
16    A.  As I recall.
17    Q.  All right.  And you used, what, that
18  information for purposes of making an opinion in this
19  section?
20    A.  No, simply as a supporting documentation.
21    Q.  Okay.  What are you relying on in that
22  article for purposes of this opinion?
23    A.  If there was an assault that occurred at the
24  jail.
25    Q.  All right.

Page 132

1    A.  The deputies involved.
2    Q.  So --
3    A.  And which starts with the City of Lyford
4  report and then it kind of goes to the county.
5    Q.  Okay.  So I'm going to make sure I understand
6  this correctly.  Your testimony here today is that
7  you're using a newspaper article that does not say
8  that charges are being brought to, I don't know, what
9  confirms some suspicion that you have that there's an
10  assault that took place?
11    A.  I didn't understand your question, Counsel.
12    Q.  Sure.
13    A.  Are you saying that -- that I --
14    Q.  No problem.
15    A.  -- it does not say that?
16    Q.  You -- but you -- you just made a
17  comment -- at least, my understanding of your comment
18  was, that there's something in this article that leads
19  you to believe an assault took place at the jail.
20  That was the comment that I remember you saying --
21    A.  Yes.  May I review the exhibit?
22    Q.  Yeah, certainly.
23    A.  It says, "Authorities are pressing charges
24  against Willacy County deputies in the February 2022
25  death of John Zamora."



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
133–136

Page 133

1    Q. It says that?

2    A. Well, that's -- I'm reading it.

3    Q. Okay.

4    A. "Willacy County will" --  Well, this is --

5    Q. Maybe -- maybe --

6    A. "District Attorney Annette Hinojosa declined

7  comment on whether she's pursuing charges, but" --

8    Q. Mr. Howse, why -- why don't you just do

9  yourself a favor and just review the article before I

10  ask any more questions about it, okay?  This is

11  not -- I don't want to do any other surprise tactic.

12  If you feel that you've used this article to support

13  anything in here, just review it, because I'm

14  completely not understanding where you're coming from.

15  So just take a second and review.

16    A. I reviewed it.

17    Q. Okay.  Fantastic.  So I'll just ask you this.

18  What specifically did you use in that article to

19  support the opinions that you made here under the

20  section entitled, general discussion of officers'

21  action at Willacy County Jail?

22    A. "Authorities are pressing charges against

23  Willacy County deputies in the February 2022 death of

24  John Ray Zamora, 33, whose family claims deputies beat

25  while in handcuffs, Attorney Israel Perez and" --

Page 134

1    Q. Okay.  Stop right there.  So you're using

2  that sentence; is that what you're saying?

3    A. Yes, sir.

4    Q. Okay.

5    A. Among other sentences.

6    Q. So who's making this statement?

7    A. This is Counsel, but they're statements from

8  the DA as well.

9    Q. Okay.  So the statement from the DA says that

10  authorities are pressing charges.  That's the point of

11  this entire article?

12    A. Declined to comment on whether authorities

13  are pressing charges is what it says here.

14    Q. Okay.  So is that the same to you as pressing

15  charges?

16    A. I have no idea.  It means what it says.

17  Declined to comment.

18    Q. Okay.

19    A. So it's a possibility.

20    Q. That's fine.  So just for, again, purposes of

21  the record, to make sure I'm understanding this

22  correctly, you used the following statement in coming

23  to you quote, "Authorities are pressing charges

24  against Willacy County deputies on the February, 2022

25  death of John Ray Zamora, 33, whose family claims

Page 135

1  deputies beat while in handcuffs, comma, Attorney

2  Israel Perez statement."

3    A. I'm using the article produced by the local

4  paper, which does include a statement by Counsel, but

5  it's from -- it's a -- it's a local paper of the

6  record article that is part of, not solely, not -- my

7  opinions are not based solely on the article.  It's

8  simply confirming there was an incident of some sort

9  and it aligns with the City of Lyford Police

10  Department report, the witness's report, the

11  toxicology reports, that also state excited delirium.

12  You cannot isolate that and say my opinion was based

13  solely on that article.

14    Q. Okay.  I'm going to stop you right there.  I

15  didn't ask you about any of the other articles.  We're

16  talking about this newspaper article, okay?  I'm

17  asking you specifically about that.  I'll just -- it's

18  okay.  It's fine.  I'm not going to beat a dead horse.

19  I'm going to give you an opportunity here to explain

20  yourself.  If the explanation is going to be, "I can't

21  isolate the information because I looked at everything

22  and I can't point to something specifically," so be

23  it, okay?

24    A. Sure.

25    Q. All right.  So let me ask the question one

Page 136

1  more times.  Are you able to state with any

2  specificity whatsoever, the type of information that

3  you used, the information that came from this

4  newspaper article, in coming to your conclusions or

5  opinions in this section?

6    A. No.

7    Q. Okay.

8    A. It was from the City of Lyford report --

9    Q. Thank you.  That's fine.  I appreciate.

10  Thank you.  All right.  Okay.  Let's go through this

11  here.  All right.  So this first paragraph here under

12  the general discussion, it's the sentence.  Again, it

13  says, "Because relevant evidence has not yet been

14  released by Willacy County, it is not possible to

15  completely evaluate the treatment of Mr. Zamora by

16  deputies while he was in their custody in route to the

17  Willacy County Jail and upon arrival and while at the

18  jail."  Is that -- is that a true statement?  Is

19  that -- did you make that statement in here?

20    A. Yes, sir.

21    Q. Okay.  And so if I'm reading this statement

22  correctly, it says, what, you don't have enough

23  information to give an opinion on how he was treated

24  either in route to the county jail, upon arrival or

25  while at the jail; is that what that's saying?



Page 137

1    A.  Not completely.  I had information, again,
2  from the medical report's autopsy, et cetera
3  that -- that trauma was involved after being taken
4  into custody.  He was taken into custody, that's
5  affirmed by the City of Lyford report.  It's confirmed
6  by City of Lyford report that he was transported by
7  Willacy County deputies, however, as I mentioned, no
8  other information has been forthcoming from Willacy
9  County regarding video -- transport video, scene video
10  or jail video.
11    Q.  Okay.  Regarding actual facts or allegations
12  of what occurred from the time he left the -- this
13  unit left the scene, in route to the jail and what
14  happened at the jail, you've seen no incident reports
15  with respect to that?  Excluding your reference to the
16  witness statements.  I'll talk about that in a minute.
17    A.  Okay.  Only the City of Lyford officers
18  stated the deputies transported him to the county
19  jail.  That's the only --
20    Q.  Got it.
21    A.  -- statement  where I can see that.
22    Q.  Okay.  And then it says, "However, Plaintiff
23  asserts Mr. Zamora was physically beaten and pepper
24  sprayed while at Willacy County Jail.  Witness
25  statement, nonsworn."  You identify as nonsworn.

Page 138

1  "Submitted for review.  Included I-witness
2  observations and Mr. Robert Reyes, an inmate trustee
3  of Willacy County Jail."  Okay.  And then, I'll let
4  you read the rest of this paragraph, but if you could
5  just read it and tell me, is that information in this
6  paragraph coming solely from the witness statements
7  that we've referred to as witness statements?
8    A.  Yes, in regarding the pepper spraying.  Yes,
9  sir.
10    Q.  No, regarding the entire paragraph.  Was that
11  information in the entire paragraph coming solely from
12  the witness statements?
13    A.  I'd have to review the witness statement, but
14  I believe it is.
15    Q.  Let me find the witness statement.
16    A.  Yes, sir.  It's a combination of witness
17  statements and plaintiff's assertions.
18    Q.  Okay.  When you say plaintiff's assertions,
19  are you referring to the original petition, or the
20  original petition and the pleading intervention?
21    A.  I believe it's both.
22    Q.  Yeah?  So witness statements and I'm going to
23  put pleadings.  So pleading intervention and the
24  original petition.  Okay.
25    The next paragraph here, "The second witness

Page 139

1  statement account sworn given by Fidel, last name not
2  reported, also, an inmate at the Wilson County Jail
3  stated he observed Mr. Zamora in handcuffs and naked
4  in his cell.  He also observed deputies laughing about
5  having pepper sprayed Mr. Zamora with some deputies
6  coughing because they had inadvertently ingested
7  pepper spray themselves."  Pardon me.
8    Please let me know if this is information solely
9  based on the witness statement, or a combination of
10  the witness statement and the plea intervention in the
11  original petition.
12    A.  Primarily the witness statement, and I think
13  it was also referenced as an assertion of plaintiff's
14  petition.
15    Q.  Okay.  Are those the only documents in
16  support of this paragraph?
17    A.  The only documents I have so far.
18    Q.  Are these the only documents in support of
19  this paragraph, just yes or no?
20    A.  Yes.
21    Q.  Thank you.  Okay.  Next paragraph, "Both
22  witnesses state that Mr. Zamora was subsequently found
23  unconscious and that emergency medical procedures were
24  started including CPR and that 911 was called.  EMS
25  arrived and transported Mr. Zamora to Valley Baptist

Page 140

1  Medical Center where he was pronounced deceased."
2    Same question, if you could just tell me the
3  documents that you reviewed in support of this
4  paragraph.
5    A.  With regard to CPR, again, witness statements
6  and then I think the article may have also referred to
7  Valley Baptist Medical Center.
8    Q.  Okay.  So for purposes of this paragraph, you
9  used the witness statement and the newspaper article?
10    A.  Yes, sir.
11    Q.  Okay.  Now, next paragraph starts out saying
12  "if the witness statements are true, and such conduct
13  and disrespect is outside the scope of generally
14  accepted police practices and procedures."  Okay.  So
15  what evidence do you have to show, other than these
16  witness statements, in support of that statement?
17    A.  Well, I've included a report, the Guidelines
18  from the International Association of Chiefs of
19  Police.
20    Q.  Oh, I'm sorry.  Strike that.  Let me rephrase
21  this.
22    What factual support did you review other than
23  the witness statements for purposes of making
24  (indiscernible)?
25    A.  The City of Lyford police report states how



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
141–144

Page 141

1 the incident began and how Mr. Zamora was then
2 transferred to the custody of Willacy County.
3    Q.  Okay.  So this particular sentence here that
4 says "if the witness statements are true, such conduct
5 and disrespect is outside the scope of generally
6 accepted police practices and procedures," you're
7 saying this sentence is coming from the City of Lyford
8 incident report?
9    A.  No, sir.  I'm -- I'm saying it says what it
10 says.  The witness -- if the witness statements are
11 true, that conduct is not within generally accepted
12 police procedures.
13    Q.  Okay.  I'm going to jump down here.  It's the
14 last of the long sentences.  The last sentence in this
15 paragraph says, "Based upon my professional training
16 and experience, and on the evidence thus far
17 submitted, it is my opinion and conclusion that the
18 Willacy County Jail staff, like the original arresting
19 deputies, failed to recognize Mr. Zamora was
20 experiencing a medical emergency requiring immediate
21 attention."
22    Okay.  What evidence do you have that shows, I
23 don't know, which deputies or how the deputies
24 specifically failed to do their jobs with respect to
25 this paragraph?

Page 142

1    A.  Well, you have to understand it was a
2 continuation from the scene to the jail, so it started
3 at the scene with the deputies.  They transported to
4 the jail.  At the jail, you have witnesses stating
5 what they say.  And again, I say it if true, that's
6 outside procedures, and we know that Mr. Zamora passed
7 away, and we also have medical reports stating why he
8 passed away.
9    And when you combine all of that with the known
10 information, then that's sufficient enough to tell me
11 that obviously something went very wrong, and if
12 indeed Mr. Zamora was -- if the witness statements are
13 true, the proper procedures were disregarded with
14 regard to medical emergencies.
15    Q.  Okay.  So that statement that you're making,
16 this is -- explain to me how that's now a guess or a
17 speculation, because it sounds to me like you're
18 saying "if true," right?  You reviewed a lot of stuff,
19 but if true, then this.  If true, then this.  So
20 explain to me how as an expert you can make an expert
21 opinion that gets to the end of the rainbow saying
22 therefore, there's, you know, a lot of problems here,
23 there's a lot of violations, etc.?
24    A.  The EFT was referring to the witness's
25 statement, as I've done throughout the report.

Page 143

1 However, what I deem to be true are the medical
2 reports, City of Lyford police report, and the fact
3 that Mr. Zamora is dead.  I find those to be true.
4 And based on the officer's conduct as set forth by the
5 City of Lyford report, that is consistent with my
6 experience in looking at arrests where there was a
7 medical emergency that was not recognized, and the
8 person was instead severely injured during the arrest
9 process and later died.  That's consistent with my
10 past experience and professional opinion.
11    Q.  Got it.  So this part here where you say,
12 "Based on my professional training experience and on
13 the evidence thus far submitted, it is my opinion and
14 conclusion that Willacy County Jail staff, like the
15 original deputies, failed to recognize Mr. Zamora was
16 experiencing a medical emergency requiring immediate
17 attention."  With respect to that statement, if all
18 you had to look at, or all you were allowed to refer
19 to was the incident report, the autopsy, and the
20 toxicology reports, would what you reviewed on those
21 three documents support this statement?
22    A.  Yes, sir.  As I've stated, it's true on the
23 witness statement part that I submit for that to be
24 true.
25    MR. HAYWARD:  Objection.  Nonresponsive.

Page 144

1 BY MR. HAYWARD:
2    Q.  So I'm asking a very specific question, okay?
3 I'm asking you whether or not this statement would be
4 supported if the only thing that you were allowed to
5 review or did review was the autopsy report, the
6 toxicology report, and the City of Lyford incident
7 report?
8    A.  I believe so.
9    Q.  Okay.  Thank you.  Okay.  And again, this
10 says, "In addition, if Mr." -- again, "If Mr. Zamora
11 was handcuffed and repeatedly pepper sprayed or
12 beaten, more likely than not such force would be
13 considered excessive for the circumstances."
14    So am I correct in saying that this is a
15 hypothetical sentence?
16    A.  If the facts are shown.  That's for the trier
17 of fact and additional information to be submitted.
18    Q.  Right.  But it's a hypothetical statement,
19 right?
20    A.  It's not hypothetical.  It's based on
21 evidence, and we know he was handcuffed, arrested,
22 transported to Willacy County Jail where he died.
23 That's not hypothetical.
24    Q.  Okay.  So again, if all you had -- or, excuse
25 me -- all you were able to review was the City of



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
145–148

Page 145

1 Lyford incident report, the autopsy report, and the
2 toxicology report. Would this sentence be supportive,
3 in your opinion? Is that enough to support that
4 sentence?
5     A. Yes, sir. I believe so.
6     Q. Okay. And then it moves to the summaries and
7 conclusions. I'm on page 11. I'm sure everybody's
8 breathing a sigh of relief.
9     MR. PEREZ: It's like getting to the Z's at a
10 graduation.
11     MR. HAYWARD: Just man, will that guy stop
12 talking? Gosh dang.
13 BY MR. HAYWARD:
14     Q. All right. Are you on page 11, sir?
15     A. Yes.
16     Q. Yes? Okay. Okay. So I'm looking at -- I'm
17 going to start, and look just kind of collectively at
18 this first conclusion and this second conclusion.
19 Okay? And specifically, I mean, would you agree with
20 me that the first conclusion is with respect
21 specifically to Officer Garcia's conduct?
22     A. Yes.
23     Q. Okay. So in this paragraph, you're not
24 talking about specifically talking about the conduct
25 of Willacy County deputies?

Page 146

1     A. Correct.
2     Q. And the second paragraph here, this is in
3 reference specifically to Willacy County deputies?
4     A. That's correct.
5     Q. Okay. And again, so I'm going to ask this
6 question again based on this paragraph number 2 where
7 you say, "It's my opinion and conclusion that the
8 conduct of Deputies Vargas, Silva, and Rivas was not
9 objectively reasonable for the circumstances, and that
10 a reasonably similarly trained and situated police
11 officer would have recognized that there was a call
12 for help." This particular sentence, you believe,
13 that this opinion is supported by facts that you
14 reviewed so far?
15     A. Yes, sir.
16     Q. Okay. Moving down to the next paragraph,
17 okay, this one looks like it goes back to Officer
18 Garcia; is that correct?
19     A. That is correct.
20     Q. Okay. So this third paragraph here, this is
21 an opinion that you're giving only about -- excuse me,
22 regarding Officer Garcia's conduct?
23     A. Yes, sir.
24     Q. Okay. Moving onto the next paragraph, this
25 paragraph, it looks like we're back talking again

Page 147

1 about Deputies Vargas, Silva, and Rivas, so this
2 paragraph is talking about the Willacy County
3 deputies' conduct; is that correct?
4     A. Correct.
5     Q. And in this paragraph, you believe, after our
6 conversation here today and the items that you've
7 reviewed support the opinions that can be made in this
8 paragraph?
9     A. Yes, sir.
10     Q. You feel that for purposes of making this
11 opinion as it appears in this report that you've
12 reviewed sufficient data in order to make this
13 opinion?
14     A. Yes. I have.
15     Q. Okay. Next paragraph, okay, this one looks
16 like again, I'm not entirely sure why this is in here,
17 but it looks like this one is again talking about the,
18 I don't know, the potential cause of action that
19 Yvonne Zamora has regarding her specific interaction
20 with the police; is that correct?
21     A. Yes, sir. This is regarding her.
22     Q. Okay. Moving on --
23     A. Well, let me clarify on that.
24     Q. Sure.
25     A. I don't -- it is unclear as to which

Page 148

1 officers, whether it was City of Lyford or Willacy
2 County deputies, that did this. So it is generally
3 vague in the sense that I've said unidentified
4 officers.
5     Q. Okay. I appreciate that. It's helpful,
6 actually.
7     This last paragraph here, so now we're back to
8 Willacy County, only this time, you're talking about
9 Willacy County Jail staff. It appears that you've, I
10 guess, made a distinction between the deputies and the
11 Willacy County Sheriff's Office jail staff; is that
12 correct?
13     A. All right. I had to use the term staff
14 because within a jail, you typically have corrections
15 officers and peace officers working side by side. And
16 because I don't have the specific documentation from
17 Willacy County, I can't speak to whether the actions
18 were aggravated by deputies or corrections officers or
19 both.
20     Q. Yeah, I'm just -- again, I'm just, if you can
21 kind of keep your answers focused on the information
22 that we've reviewed and make any opinions on this
23 report, okay?
24     A. Yes, sir. I base that off the City of Lyford
25 report stating that they were transported to Willacy



Page 149

1    County Jail.
2        Q.  Got it.  So the fact that they were
3    transported to Willacy County Jail in the Lyford
4    report is what's giving you the support to make this
5    opinion?
6        A.  In addition to the witness statements of
7    individuals who were present at the Willacy County
8    Jail.
9        Q.  Right.  The witness statements -- right, the
10   witness statements and also what, the petition and
11   maybe the pleading intervention?
12       A.  I think it's primarily the witness statements
13   and the City of Lyford report.
14       Q.  Got it.  Okay.  Let's go to the -- actually,
15   let's stick with this one.  I kind of forgot that this
16   continues.  It says, the last part of this paragraph
17   says, "And that such conduct is not within generally
18   accepted policies" -- excuse me, "police practices and
19   procedures and indicates a deliberate indifference to
20   the safety and welfare of those persons in their
21   custody."
22       So again, that statement, in your opinion, is
23   supported by the, I guess specifically in this
24   paragraph the witnesses.  Is that your testimony?
25       A.  Yes, sir.  The evidence submitted thus far,

Page 150

1    the witness statements, and the fact that this
2    occurred, based on the City of Lyford report, at the
3    Willacy County Jail.  And based on the medical reports
4    of the death of Mr. Zamora.
5        Q.  I don't want to get confused.  The City of
6    Lyford report doesn't say anything about what happened
7    at the jail, right?
8        A.  No.  Just establishes that's where they were
9    transferred.
10       Q.  Okay.  Got it.
11       A.  Because he was transferred.
12       Q.  Okay, thanks.  Okay.  So next paragraph, "My
13   forementioned conclusions are based on a reasonable
14   degree of certainty."  Okay.  Let's just take that.
15   So again, I'll just give you the opportunity real
16   quick.  So all the opinions made in this report,
17   whether or not made as a result of reviewing the
18   witness statements or the incident report, all of the
19   opinions that you made in this report, you're stating
20   here are made within a reasonable degree of certainty;
21   is that right?
22       A.  Yes, sir.  I believe so.
23       Q.  Okay.
24          MR. HAYWARD:  I may have something more, but
25   I'll pass the witness at this time.

Page 151

1                   EXAMINATION
2    BY MR. ERWIN:
3        Q.  Mr. Howse, my name is Alan Erwin.  I
4    represent the Lyford Police Department and the City of
5    Lyford.
6        A.  Yes, sir.
7        Q.  During your time at the Department of Public
8    Safety, how many employees did you encounter that were
9    going through (indiscernible)?
10       A.  How many incidents?
11       Q.  Yeah.
12       A.  This would just be a guestimate, but probably
13   I would say half a dozen to a dozen, keeping in mind
14   that we also operated a level 1 trauma center, and
15   sometimes those circumstances are not necessarily
16   based on an enforcement action.
17       Q.  So half a dozen to a dozen over how many
18   years?
19       A.  Well, I was there just about 20 years.
20       Q.  Okay.  So anywhere from one every third year
21   to one every second year?
22       A.  I don't have a specific listing to, you know,
23   be fair.  I'm just estimating off the top of my head
24   the kinds of incidents that I recall.
25       Q.  It's not common, is it?

Page 152

1        A.  Excited delirium?
2        Q.  Right.
3        A.  It is not what I would call your everyday
4    call, but it is common enough that TCOLE mandates
5    training on it.
6        Q.  And while you're at Baylor, you're there with
7    a world class medical center there, right?
8        A.  I believe so.
9        Q.  You said that you had access to a level 1
10   trauma center, correct?
11       A.  Correct.  Yes, sir.
12       Q.  What EMS services were available to Officer
13   Garcia during Lyford while aiding February 11th, 2022?
14       A.  Well, all I have to go on is the City of
15   Lyford report which doesn't mention EMS being called.
16       Q.  You never looked into that?
17       A.  Did I investigate that separately?  No, sir.
18       Q.  Well, one of your criticisms was that Officer
19   Garcia did not one, recognize that this gentleman was
20   going through some kind of excited delirium, and two,
21   didn't call EMS, correct?
22       A.  Yes, sir.
23       Q.  Okay.  Now, my question is is what EMS
24   services did Officer Garcia have available to him that
25   evening?



Page 153

1   A. I presume every jurisdiction has an EMS
2 service available, either through the county or city
3 or district.
4   Q. Okay. So you don't know. You're making a
5 presumption, correct?
6   A. No. I do know. EMS is available to every
7 law enforcement agency.
8   Q. Some kind of EMS, not a level 1 trauma
9 center, right?
10   A. Oh, no, sir. I'm not -- I'm not trying to
11 say EMS is a level 1 trauma center. I'm just saying
12 that EMS is available.
13   Q. And you didn't look into what sort of EMS
14 services were available at Lyford, correct?
15   A. No, sir, because I know EMS services are
16 available everywhere.
17   Q. Okay. The six paragraphs that you've got in
18 your incident summary with regard to Officer Garcia --
19   A. Yes, sir.
20   Q. -- other than the Lyford Police Department
21 report, was there any other document or information
22 that you considered factual that are relevant to it,
23 to the incident summary?
24   A. Well, the medical reports that I discussed
25 earlier confirm my initial observations. They were

Page 154

1 based on the City of Lyford report, based on Officer
2 Garcia's observations, written observations.
3   Q. Do you disagree with anything Officer Garcia
4 wrote up on that report?
5   A. Disagree in the sense of what he observed or
6 his actions?
7   Q. Well, it's your report. You put it in here.
8   A. Well, I disagree --
9   Q. Did you put anything in here in the incident
10 summary, these six paragraphs, that you think is not
11 true?
12   A. No. I don't think I put anything in there
13 that's not true.
14   Q. Okay. This incident summary was based on, in
15 large part, if not in whole part, on Officer Garcia
16 himself, correct?
17   A. On his official observations that he recorded
18 in his report.
19   Q. Now, Officer Garcia, it says here that he
20 reported that he observed the three deputies on the
21 ground with Mr. Zamora and that Mr. Zamora was
22 resisting arrest at that time. Do you have any
23 information or documentation that you consider to be
24 factual that is inconsistent with that?
25   A. If they were wrestling on the ground solely,

Page 155

1 I have no reason to dispute that.
2   Q. And there's no other information brought to
3 you that would lead you to determine otherwise,
4 correct?
5   A. Well, yes, sir. The leading to the wrestling
6 on the ground, Officer Garcia already stated in his
7 report that not only did he -- did Mr. Zamora tell him
8 he had been using drugs, but he reported that Mr.
9 Zamora was acting strangely and thought someone was
10 chasing him and -- and various comments he made in his
11 report which again, are signs of potential excited
12 delirium.
13   Q. Well, I have to object to your answer being
14 nonresponsive to my question because my question was
15 simply whether you knew any -- had any information
16 that you considered to be factual that Officer Garcia
17 didn't see that Mr. Zamora was resisting arrest while
18 these three gentlemen were trying to take advantage to
19 arrest him?
20   A. No. I believe that's what he observed. Yes.
21   Q. Okay. And again, no information to the
22 contrary, correct?
23   A. Regarding just the physical contact?
24   Q. With regard to Officer Garcia seeing that Mr.
25 Zamora was resisting arrest.

Page 156

1   A. Yes.
2   Q. You don't have anything that contradicts
3 that, correct?
4   A. That's correct.
5   Q. And as far as anything physical that Officer
6 Garcia did, all you found was that he assisted these
7 three gentlemen in handcuffing Mr. Zamora while he was
8 resisting arrest, correct?
9   A. From a solely a physical perspective, that
10 was the question?
11   Q. That was the question, yes. Is that correct?
12   A. Yes, sir.
13   Q. Okay. You haven't seen or you don't have
14 any -- the bottom line is you don't have any
15 information that Mr. Garcia used the taser -- Officer
16 Garcia used the taser at the scene, do you?
17   A. That's correct.
18   Q. No information that he used any sort of
19 pepper spray at the scene, correct?
20   A. Correct.
21   Q. The bottom line is that all he did was help
22 handcuff this gentleman and then the Willacy County
23 officers took him in from there and that ended Officer
24 Garcia's involvement in this, didn't it?
25   A. No, sir.



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
157–160

Page 157

1    Q.  How did it not end his involvement?  What did
2    he -- what contact did Officer Garcia have with Mr.
3    Zamora after Mr. Zamora was taken into custody by the
4    Willacy County Sheriff's Department?
5    A.  Well, I was just making clear, I think you
6    said all.  There was previous -- Mr. Garcia was on the
7    scene and then left the scene, then he returned and
8    that's when he observed the --
9    Q.  The moment that this gentleman was placed in
10   a Willacy County unit and taken to Willacy County
11   Jail, Officer Garcia had no further contact with Mr.
12   Zamora, correct?
13   A.  I believe that's correct.
14   Q.  Okay.  The fact or allegation that Officer
15   Garcia didn't call EMS to the scene, you wouldn't
16   consider that to be use of excessive force, correct?
17   A.  I would consider that a contributing factor.
18   Q.  Would you consider it to be the use of
19   excessive force?
20   A.  Not with a hands-on approach, but it would be
21   the denial of medical care.
22   Q.  It wouldn't be a seizure, would it?
23   A.  A seizure as in the sense of --
24   Q.  Seizure of his --
25   A.  -- custody?

Page 158

1    Q.  Not seizing this person by failing to do
2    something, correct?
3    A.  No, sir.  I don't think so.
4    Q.  It's not a search of Mr. Zamora, either, by
5    making a decision not to call EMS, correct?
6    A.  No, sir.  I don't believe it would be.
7    Q.  Do you understand that Officer Garcia and the
8    Willacy County folks, they're not being sued for
9    violating any kind of oath, right?
10   A.  I don't know that, sir.
11   Q.  Well, you've reviewed both the petition and
12   the petition and the (indiscernible).
13   A.  Yes, sir.  I have.
14   Q.  And your lawyers, right?
15   A.  Yes, sir.
16   Q.  Okay.  Was there anything in that petition
17   where they were alleging that this gentleman's death
18   was caused by someone violating the oath?
19   A.  No, sir.  The reason I listed the oath in
20   there was because it -- it mentions the constitution.
21   Q.  Okay.  What did Officer Garcia do to deprive
22   Mr. Zamora of any rights, privileges, or immunities
23   that adhere by the United States Constitution or its
24   laws?
25   A.  He assisted, based on his report, he assisted

Page 159

1    the Willacy County deputies in restraining Mr. Zamora
2    after he had knowledge of potential drug use and
3    symptoms of excited delirium had presented itself to
4    his knowledge.
5    Q.  Okay.  That's it, right?
6    A.  There -- there was an issue with regard to
7    search and seizure that I discussed.
8    Q.  Well, entitled to seize a bag at one
9    particular time that allegedly contained drugs in it,
10   correct?
11   A.  Yes.
12   Q.  A backpack.  That would be a non-seizure,
13   right?  A non-search and seizure, correct?
14   A.  Yes, sir.  But it would have --
15   Q.  So that would be a violation of the
16   Fourteenth Amendment to make a decision not to take
17   possession of a backup that may or may not have drugs
18   in it, correct?
19   A.  Not -- yes, sir.  Not specifically.
20   Q.  Okay.  Thank you.  Who's the owner of 7342
21   Davao (ph) Street?  Did you ever get an answer to
22   that?
23   A.  Yes.  I believe it might have been in one of
24   the petitions, but there was a statement to the effect
25   of the owner of the residences, as I recall.

Page 160

1    Q.  Okay.  And who was your understanding that
2    it's to.  They don't have a residence where this
3    incident that happened.
4    A.  I have to look it up here.  I think it was
5    Mr. Roque or --
6    Q.  Roque Romo?
7    A.  Yes, sir.  I think that's correct.
8    Q.  Who is he?
9    A.  Well again, I believe he was -- I believe it
10   was his residence where the incident occurred.
11   Q.  Do you know if he's related to any of these
12   folks?
13   A.  I have no idea, sir.
14   Q.  You may have answered this, but have you
15   wanted to go to this at all yourself to get any facts
16   to write your report and make your opinions in this
17   case?
18   A.  No, sir.  Not at all.  I operate with the
19   information that is submitted for review and whether
20   or not that is customary information for this kind of
21   incident.
22   Q.  Is that a no?
23   A.  It's a no to her, yes.
24   Q.  Okay.  And I think you already said that
25   Yvonne Zamora, you did not interview her either,



Page 161

1  correct?
2      A. That's -- that's correct.
3      Q. Okay.
4          MR. ERWIN: All right. That's all I have at
5  this time.
6                  EXAMINATION
7  BY MR. PEREZ:
8      Q. Mr. Howse, I want to talk more briefly about
9  your time at Baylor Med Center. You said it was on 40
10  blocks; is that right?
11     A. Approximately. It's grown even since then.
12     Q. And that area encompasses (indiscernible) and
13  (indiscernible) Park, that area; is that right?
14     A. Yes, sir. Sometimes it's called Old East
15  Dallas. It is urbanized downtown kind of environment.
16     Q. Is that a high-crime area?
17     A. Yes, sir.
18     Q. I guess was it a high-crime area at the time
19  that you were working at Baylor University Med Center?
20     A. Yes, sir.
21     Q. You mentioned that one of the officers that
22  you supervised had responded to a 7/11 theft. Was
23  that normal to happen there within those 40 blocks at
24  Baylor University Med Center?
25     A. Yes. It was located basically across the

Page 162

1  street from the other major medical buildings.
2      Q. I guess was violent crime I guess a regular
3  occurrence in those 40 blocks?
4      A. Yes, sir.
5      Q. So through that experience, then would you
6  know, I guess, how police officers should use deadly
7  force or use any force at all if necessary?
8      A. Yes, sir. I was a trainer with the
9  department, a field training -- a field trainer for
10  new officers. Then, I was also a trainer in our
11  training department providing TCOLE-approved training
12  to our officers and other agencies. And also
13  participated in what we call situational exercises,
14  which is shoot, don't shoot, that kind of thing,
15  arrest, don't arrest.
16     Q. I guess for folks don't know the 40-block
17  area, is it the kind of place that I guess you leave
18  the car door unlocked or you go at night?
19     A. Well, no, sir. I mean, obviously Deep Ellum
20  is a nighttime attraction predominantly and, as I
21  mentioned, consists of bars and clubs and restaurants
22  and entertainment venues. That was adjacent to one
23  side of the campus and there was a lot of spillover,
24  particularly during the summer, onto the campus
25  itself.

Page 163

1      Q. Okay. Now I want to talk about, and this
2  kind of -- the bar discussion kind of spills over into
3  this talking about excited delirium syndrome. Can you
4  kind of discuss and explain what is that?
5      A. Excited delirium, and again, TCOLE provides
6  this training. It has always been an issue, but here
7  now, TCOLE does require excited delirium training for
8  all peace officers no matter where you work. But
9  basically, it's a concept, and as we discussed
10  earlier, there's some medical opinions, whether that's
11  an official diagnosis or not, but whether they're
12  consistent or not, there's no doubt about that.
13         And what that is, officers are trained that look
14  if you have interviewed somebody that's acting
15  erratically, hallucinating, admitting to drug use or
16  has drugs on them, often times cocaine, and they are
17  exhibiting that behavior, erratic behavior, that is a
18  classic sign of excited delirium, or it could be
19  something else. But it still -- it's a medical -- we
20  train officers to understand that. Then it becomes a
21  medical emergency.
22     Q. All right. And what are officers supposed to
23  do at that point?
24     A. Summon EMS, try not to agitate the
25  individual, restrain them to the extent that one can

Page 164

1  do so without causing injury, you know, just
2  self-protect, much like someone who's having a seizure
3  or something. And try to, as best you can, determine
4  what the causes are. In other words, what were the
5  (indiscernible) taken? Is the person exhibiting any
6  dangerous behavior to themselves or someone else, and
7  have additional officers arrive on scene to help you.
8  So you can try to reason, try to understand what the
9  base nature is of their odd behavior.
10     Q. And I guess in dealing with excited delirium
11  syndrome, does it have anything to do with trauma
12  treatment at all?
13     A. Well --
14     Q. And I guess, let me ask you this. Let me ask
15  you this.
16     A. Yeah.
17     Q. What officers are supposed to do, does that
18  change whether or not you have a level 1 trauma center
19  right next to you?
20     A. No. The TCOLE training for officers is TCOLE
21  training for officers. The fact that we had a
22  convenient level 1 trauma center was helpful, but that
23  has nothing to do with the training of the officers.
24  The training of the officers is to notify EMS and get
25  them there to help stabilize the patient prior to



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
165–168

Page 165

1   doing anything else.
2       Q.  And what the officers are supposed to do,
3   does that change whether they're in a jail setting or
4   not a jail setting?
5       A.  It could occur in a jail setting or an
6   on-scene setting if there wasn't, again, in this case,
7   if it wasn't detected by the officers on-scene, then
8   it can still manifest at the jail, yes.
9       Q.  I guess what the officers are supposed to do,
10  is it universal?  Is it just commonly known to all
11  police officers?
12      A.  Well, it should be known.  Yes, that's the
13  training.
14      Q.  Whether they're in a shopping center as you
15  see one of their cases was, or if it's I guess near a
16  level 1 trauma center, no matter where the location
17  is, this is what police officers are supposed to do?
18      A.  Absolutely.  Regardless of location anywhere
19  in the state of Texas, the Commission of Law
20  Enforcement has set forth the training standards and
21  guidelines and individual departments, most of them.
22  I don't know all of them, of course, but most of them
23  have developed their own policies that incorporate
24  that training.
25      Q.  Now, this training, I guess should all police

Page 166

1   departments adhere to this training for excited
2   delirium syndrome?
3       A.  Yes, sir.  It's a TCOLE mandate.
4       Q.  And if a county, sheriff's department, or a
5   city police department doesn't have policies regarding
6   this, would that be any sort of violation of standard
7   of care?
8       A.  Yes, sir.  It would.  It would be outside
9   generally accepted lease practices and procedures as
10  well as the State of Texas TCOLE mandate.
11      Q.  And if it had a custom that went against this
12  mandate, would that also be a violation of generally
13  accepted practices?
14      A.  Yes, sir.  It could be an indication of
15  deliberate indifference toward the safety of people in
16  their custody.
17      Q.  Let's see here, so we heard about how the
18  written statements, or witness statements, rather,
19  that you reviewed, they were not sworn.  The incident
20  report from the City of Lyford, was that sworn?
21      A.  I don't believe it was sworn.
22      Q.  Was the autopsy report sworn?
23      A.  I don't believe those were sworn either.
24  They were official letterhead-type documents.
25      Q.  Was the toxicology report sworn?

Page 167

1       A.  I don't believe so.
2       Q.  Whenever you review one of these cases, you
3   say you've reviewed these cases before, do you
4   typically talk to any of the folks that issue it,
5   whether that be, you know, Frank Salinas, the issuer
6   of the autopsy, or whoever it might be?
7       A.  Generally, no.  Generally, I rely upon the
8   documents that have been submitted as evidence.
9       Q.  And again, we're talking about other
10  documents that were submitted -- that were not
11  submitted as evidence including video.  What video
12  would you expect to see in an incident such as this
13  one?
14      A.  Well, again, technically there would be the
15  City of Lyford Officer Garcia bodycam if he had one,
16  or dashcam if he had one, or any audio recording, if
17  he had one.  Then, with Willacy County, there would be
18  same thing, the deputy's bodycams if they were so
19  issued, deputy's vehicle cams, which capture both the
20  front and the prisoner transport rear, or should have
21  captured the rear of the police vehicle that would
22  show Mr. Zamora being transported, as well as arrival
23  at the jail.  The jail should be equipped with
24  surveillance cameras in the booking area as well as
25  generally through and throughout the jail.

Page 168

1       Q.  The cell phone video that Ms. Zamora took,
2   would that have been helpful?
3       A.  Yes.
4       Q.  And just to clarify, it's not in police
5   practices typically to delete cell phone video; is
6   that right?
7       A.  That's correct.
8       Q.  From what you've reviewed, was Mr. Zamora
9   showing signs of excited delirium syndrome?
10      A.  Based on the report that Officer Garcia
11  wrote, that was the very first thing that jumped out
12  at me as he was describing the perfect classic, I
13  guess you'd say, excited delirium contact.
14      Q.  And from the report, did it appear that
15  Officer Garcia had received any training on excited
16  delirium syndrome?
17      A.  I don't have his training records, but all I
18  can state is that he did not -- appears to not have
19  recognized what he was dealing with regard to Mr.
20  Zamora's actions and admitted drug use.
21      Q.  And the sheriff's deputies, did they appear
22  to recognize the excited delirium syndrome?
23      A.  I have no documentation that -- that notes
24  that they did.  It appears to me, based on the City of
25  Lyford report, and that they were treating Mr. Zamora



Page 169

1  as someone who was resisting arrest and wrestling with
2  him and handcuffing him, so that is an indicator to me
3  that they did not.
4         MR. PEREZ:  I'll pass the witness.
5         MR. HAYWARD:  Anybody else?
6         MR. PEREZ:  Mr. Youngs?
7         MR. YOUNGS:  I have no questions for the
8  witness.
9         MR. HAYWARD:  Just give me one second,
10 please.  I'm good.  I'll reserve the rest of my
11 questions.  Thanks.
12        THE REPORTER:  Anybody else?  No?  Okay.  Let
13 me go ahead and take transcript orders.  Give me one
14 second here.
15        Okay.  Mr. Hayward, I just want to confirm
16 electronic, 10 standard business days?  Electronic, 10
17 standard business days?
18        MR. HAYWARD:  Yes.  Thanks.
19        THE REPORTER:  Perfect.
20        Mr. Erwin, you would like a copy, a rough
21 draft, and 10 business days?
22        MR. ERWIN:  (No audible response.)
23        THE REPORTER:  Mr. Perez, would you like copy
24 today?
25        MR. PEREZ:  Yes, please.

Page 170

1         THE REPORTER:  Electronic, 10 standard
2  business days?
3         MR. PEREZ:  Yes.  That's not rough, right?
4         THE REPORTER:  Nope, standard.
5         MR. PEREZ:  Okay.
6         THE REPORTER:  Mr. Youngs, would you like
7  copy today?
8         MR. YOUNGS:  Not today.  I sent everything
9  over in the chat though.
10        THE REPORTER:  Perfect.  Sounds good.
11        And then Mr. Howse, I just wanted to
12 confirm --
13        (Crosstalk.)
14        THE REPORTER:  Mr. Howse, I just wanted to
15 confirm that you would like to go ahead and read and
16 sign?
17        MR. PEREZ:  Yes.  That is counsel's
18 preference.
19        THE WITNESS:  Yes.
20        THE REPORTER:  Okay.  Sounds good.
21        THE VIDEOGRAPHER:  We are off the record at
22 2:07 p.m.
23        (Whereupon, the deposition concluded at 2:07 p.m.)
24
25

Page 171

1                    CHANGES AND SIGNATURE
2  WITNESS NAME:  KEITH ALLAN HOWSE
3  JOB NO. J9927495
4  DATE OF PROCEEDING:  JULY 25, 2023
5  Page, Line      Change        Reason
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25

Page 172

1         I, KEITH ALLAN HOWSE, have read the foregoing
2  transcript and hereby affix my signature that same is
3  true and correct, except as noted on the previous
4  page.
5
6  _____
7  KEITH ALLAN HOWSE
8
9  THE STATE OF TEXAS
10 COUNTY OF _____
11
12 Before me, _____, on this day
13 personally appeared KEITH ALLAN HOWSE,  known to me
14 (or proved to me under oath or through
15 _____) to be the person whose name
16 is subscribed to the foregoing instrument and
17 acknowledged to me that they executed the same for the
18 purposes and consideration therein expressed.
19 Given under my hand and seal of office this _____ day
20 of _____ 2023.
21
22
23 _____
24 Notary Public in and for
25 the State of Texas



Page 173

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2               BROWNSVILLE DIVISION
 3
    BLANCA GOMEZ, ET AL.,
 4
                 Plaintiffs,
 5
        AND                        C.A. NO.
 6
    YVONNE MICHELLE ZAMORA,      1:22-CV-00036
 7
            Plaintiff-Intervenor,
 8
        vs.
 9
10  CITY OF LYFORD, ET AL.,
11               Defendants.
12
13
              REPORTER'S CERTIFICATE
14
          DEPOSITION OF KEITH ALLAN HOWSE
15
16
17  I, TAUNEE DRECHSEL, Digital Reporter and Notary Public
    for the State of Texas, hereby certify to the
18  following:
19  That the witness, KEITH ALLAN HOWSE was duly sworn by
    me and that the testimony was accurately captured with
20  annotations by me during the proceeding;
21  That the transcript was submitted on _____ to the
    witness for examination, signature, and returned to me
22  by _____, 2023.
23  The amount of time used by each party at the
    proceeding was as follows:
24
25          John-Michael Hayward, Esq. - 03:19:00
```

Page 174

```
 1          D. Alan Erwin, Jr., Esq. - 00:13:00
 2          Israel Perez, Esq. - 00:11:00
 3          Christopher Youngs, Esq. - 00:00:00
 4
 5  That $_____ is the deposition officer's charges to
    counsel for preparing the original deposition
 6  transcript and any copies and any copies of exhibits;
 7  That pursuant to information given to the deposition
    officer at the time said testimony was taken, the
 8  following includes counsel for all parties of record:
 9  JOHN-MICHAEL HAYWARD, Esq., Attorney for Defendant
    Willacy County and Willacy County Sheriff's Department
10  D. ALAN ERWIN, JR., Esq., Attorney for Defendant
    Lyford Police Department
11  ISRAEL PEREZ, Esq., Attorney for Plaintiff Blanca
    Gomez, et al.
12  CHRISTOPHER YOUNGS, Esq., Attorney for Intervenor
    Yvonne Michelle Zamora
13
    I further certify that I am neither counsel for,
14  related to, nor employed by any of the parties or
    attorneys in the action in which this proceeding was
15  taken, and further that I am not financially or
    otherwise interested in the outcome of the action.
16  Further certification requirements pursuant to 203 of
    TCRP will be certified to after they have occurred.
17
    Certified to me this 04 August, 2023.
18
19
20
                    Taunee Colene Drechsel
21  TAUNEE DRECHSEL
    Notary Commission No. 133395146
22  Commission Expires:  October 15, 2025
    Firm Registration No. 3
23
24
25
```

Page 175

```
 1       FURTHER CERTIFICATION UNDER RULE 203 TCRP
 2
 3  The original deposition was/was not returned to the
    deposition officer on _____.
 4
    If returned, the attached Change and Signature page
 5  contains any changes and the reasons therefor;
 6  If returned, the original deposition was delivered to
    JOHN-MICHAEL HAYWARD, Esq., Custodial Attorney.
 7
    That $_____ is the deposition officer's charges to
 8  the custodial party for preparing the original
    deposition transcript and any copies of exhibits.
 9
    That the deposition was delivered in accordance with
10  Rule 203.3, and that a copy of this certificate was
    served on all parties shown herein on _____ and
11  files with the Clerk.
12  Certified to me by this 04 August, 2023
13
14
15
                    Taunee Colene Drechsel
16  TAUNEE DRECHSEL
17  Notary Commission No. 133395146
    Commission Expires:  October 15, 2025
    Firm Registration No. 3
18
19
20
21
22
23
24
25
```

Page 176

```
 1          CERTIFICATE OF TRANSCRIPTIONIST
 2
 3      I, Courtney Montgomery, legal
 4  transcriptionist, do hereby certify:
 5      That the foregoing is a complete and accurate
 6  transcript of the original digital audio recording of
 7  the testimony and proceedings captured in the above
 8  entitled matter.  As the transcriptionist, I have
 9  reviewed and transcribed the entirety of the
10  proceeding to ensure a verbatim record to the best of
11  my ability.
12      I further certify that I am not neither
13  attorney for, nor a relative or employee of any of the
14  parties to the action; further, that I am not a
15  relative or employee of any attorney employed by the
16  parties hereto, nor financially or otherwise
17  interested in the outcome of this matter.
18      In witness thereof, I have hereunto set my
19  hand this 04 August, 2023.
20
21
22
23                    Courtney Montgomery
24                    Legal Transcriber
25
```



KEITH ALLAN HOWSE
BLANCA GOMEZ V. CITY OF LYFORD

July 25, 2023
177–179

Page 177

```
 1   Reference No.: 9927495
 2
 3   Case:  BLANCA GOMEZ V. CITY OF LYFORD
 4
         DECLARATION UNDER PENALTY OF PERJURY
 5
         I declare under penalty of perjury that
 6   I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the
 7   same has been read to me, and the same is
     true and accurate, save and except for
 8   changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET
 9   hereof, with the understanding that I offer
     these changes as if still under oath.
10
11   _____
12         Keith Allan Howse
13
14         NOTARIZATION OF CHANGES
15             (If Required)
16
17   Subscribed and sworn to on the _____ day of
18
19   _____, 20____ before me,
20
21   (Notary Sign)_____
22
23   (Print Name)             Notary Public,
24
25   in and for the State of _____
```

Page 178

```
 1   Reference No.: 9927495
     Case:  BLANCA GOMEZ V. CITY OF LYFORD
 2
 3   Page No._____Line No._____Change to:_____
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7   _____
 8   Reason for change:_____
 9   Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24
     SIGNATURE:_____DATE:_____
25   Keith Allan Howse
```

Page 179

```
 1   Reference No.: 9927495
     Case:  BLANCA GOMEZ V. CITY OF LYFORD
 2
 3   Page No._____Line No._____Change to:_____
 4   _____
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7   _____
 8   Reason for change:_____
 9   Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24
     SIGNATURE:_____DATE:_____
25   Keith Allan Howse
```

